[No. C061102. Third Dist. Jan. 26, 2011.]

CALIFORNIA STATEWIDE LAW ENFORCEMENT ASSOCIATION, Plaintiff and Respondent, v.
DEPARTMENT OF PERSONNEL ADMINISTRATION, Defendant and Appellant.

**COUNSEL**

K. William Curtis, Warren C. Stracener, Linda A. Mayhew, Kevin A. Geckeler and Will M. Yamada for Defendant and Appellant.

Carroll, Burdick & McDonough, Gary M. Messing and Jason H. Jasmine for Plaintiff and Respondent.

## OPINION

**SCOTLAND, J.**[*]—Many millions of dollars are at stake in this case. At issue is the process by which a public employee labor union and the Governor negotiate benefits for state employees and then present their collective bargaining agreement to the Legislature for approval and funding. Such agreements, which have been under the public's radar in the past, are now coming to light due to the massive budget deficit the state is facing.

California's collective bargaining system for state employees provides an enhanced pension benefit for what are known as "safety members." The "common thread" that has made employees eligible for safety member retirement status is that their principal duties expose them "to potentially hazardous activity" (*Glover v. Board of Retirement* (1989) 214 Cal.App.3d 1327, 1333 [263 Cal.Rptr. 224]) and the " 'risk of injury from the necessity of being able to cope with potential dangers inherent in [the principal duties of the job].' [Citations.]" (*City of Huntington Beach v. Board of Administration* (1992) 4 Cal.4th 462, 469 [14 Cal.Rptr.2d 514, 841 P.2d 1034]; see also *City of Oakland v. Public Employees' Retirement System* (2002) 95 Cal.App.4th 29, 63 [115 Cal.Rptr.2d 151].) Hence, peace officers, firefighters, and correctional officers are safety members. (See, e.g., Gov. Code, §§ 20390, subd. (a) ["principal duties consist of active law enforcement service"], 20398, subd. (a)(1) ["principal duties consist of active firefighting/fire suppression"], 20403 [duties performed in prisons and by parole agents].)

Safety members receive a more generous retirement formula, and thus more generous pensions, than do other state employees who are known as "miscellaneous members." Consequently, some state employee collective bargaining units have, over the years, sought safety member status for their members. This litigation involves one such successful effort.

The California Statewide Law Enforcement Association (CSLEA) represents state Bargaining Unit 7 (Unit 7).[1] The president of CSLEA described Unit 7 as follows: "It's about half and half, half sworn [peace officers] and half regulatory. Obviously everyone knows what the sworn officers do. The regulatory folks are assigned to, you know, all the different departments [of state government]. [For example,] DMV has sworn investigators, and they have licensing reps that go out. And you know, those reps go out to all the different businesses that sell cars, and many of the times they're in shady areas, things like that. [¶] You've got cosmetology people who go out and who work investigating the different hair salons for cleanliness those sorts of

---

[*]Retired Presiding Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] CSLEA was formerly known as CAUSE, the California Union of Safety Employees.

things. They issue citations. [¶] . . . DMV [has] licensing registration examiners, those folks . . . [who] do the licensing of the drive tests. [¶] [Also in Unit 7 are] criminalists . . . [who] have an extremely important and dangerous job by going out to the different crime labs and working with extremely volatile chemicals . . . ."

In March 2002, CSLEA reached agreement with the Department of Personnel Administration (DPA) to reclassify employees of Unit 7 from miscellaneous member retirement status to safety member status, thus increasing their pension benefits. A memorandum of understanding (MOU) was approved by the Legislature in Senate Bill No. 183 (2001–2002 Reg. Sess.) (Senate Bill 183), codified in part in Government Code section 19816.21, subdivision (a)(1). (Stats. 2002, ch. 56.)

An arbitrator found that DPA and CSLEA agreed to confer safety member status retroactively and thereby to include in that status all prior service of Unit 7 employees while they were in miscellaneous member status. Stated another way, even though their prior years of service were as miscellaneous members, those years would be converted into safety member status to provide Unit 7 employees with more generous retirement service credit for the years of service they worked as miscellaneous members.

Over DPA's objection, a Sacramento County Superior Court judge confirmed the arbitration award.

On appeal, DPA contends the arbitrator's decision must be vacated on the ground that the award violates the public policy embodied in the Ralph C. Dills Act (Dills Act) (Gov. Code, § 3512 et seq.; further section references are to the Government Code unless otherwise specified) because the portion of the agreement conferring retroactive safety member retirement service credit was not presented to, and approved by, the Legislature. We agree.

As we will explain, we defer to the arbitrator's decision, based on extrinsic evidence, that the agreement between DPA and CSLEA to move employees of Unit 7 into safety member retirement status included an agreement to apply the new status retroactively to encompass all prior service credit by members employed as of July 1, 2004. However, the MOU presented to the Legislature did not contain language that the change to safety member status would apply retroactively to convert prior miscellaneous member status to safety member status; Senate Bill 183 was "silent" as to whether the benefit would apply retroactively to prior service; and the Legislature was not provided with a fiscal analysis of retroactive application of the agreement. Because the part of the agreement giving Unit 7 employees retroactive safety service credit was never explicitly presented to the Legislature for approval,

as required by section 3517.61 of the Dills Act, the arbitrator erred in concluding that Senate Bill 183 mandates retroactive safety member retirement benefits. Accordingly, we will reverse the judgment to that extent. The retroactive part of the agreement may be enforced only if it and its fiscal consequences are explicitly submitted to, and approved by vote of, the Legislature.

## BACKGROUND

### A

CSLEA is the exclusive bargaining representative for Unit 7, which is comprised of approximately 7,000 state employees.

In early 2002, the president of CSLEA, Alan Barcelona, met with Governor Gray Davis to discuss CSLEA's third attempt to reclassify its members into safety member retirement status. Governor Davis told Barcelona that, if he sponsored legislation to move CSLEA's members into safety member status, the Governor would sign it. The Governor then told DPA director Marty Morgenstern to meet with CSLEA to implement a plan to reclassify the majority of CSLEA's members.

In March 2002, DPA and CSLEA entered into a written agreement, providing that classifications within Unit 7 are related to public safety and that "[o]n July 1, 2004, those classifications currently in the Miscellaneous Retirement category and not otherwise indicated shall be moved to the Safety Retirement category."

### B

Existing law permitted DPA to determine which classes of positions meet the criteria for safety member retirement status (§ 19816.20);[2] to agree to

---

[2] Section 19816.20 provides in pertinent part: "(a) [DPA] shall determine which classes or positions meet the elements of the criteria for the state safety category of membership in the Public Employees' Retirement System. An employee organization or employing agency requesting a determination from [DPA] shall provide [DPA] with information and written argument supporting the request. [¶] . . . [¶] (c) [DPA] shall not approve safety membership for any class or position that has not been determined to meet all of the following criteria: [¶] (1) In addition to the defined scope of duties assigned to the class or position, the member's ongoing responsibility includes: [¶] (A) The protection and safeguarding of the public and of property. [¶] (B) The control or supervision of, or a regular, substantial contact with one of the following: [¶] (i) Inmates or youthful offenders in adult or youth correctional facilities. [¶] (ii) Patients in state mental facilities that house Penal Code offenders. [¶] (iii) Clients charged with a felony who are in a locked and controlled treatment facility of a developmental center. [¶] (2) The conditions of employment require that the member be capable of responding

provide safety member status by an MOU reached pursuant to section 3517.5;[3] and to notify the California Public Employees' Retirement System of DPA's determination (§ 20405.1).[4]

But the law precluded DPA from approving safety member status for any class or position that did not meet criteria specified in subdivision (c) of section 19816.20 (fn. 2, *ante*). Since employees in Unit 7 did not meet those criteria, it was necessary to seek legislation permitting safety member status for Unit 7. (See also § 3517.6, subd. (b) [if any provision of a collective bargaining MOU requires the expenditure of funds or is not statutorily exempt from further legislative action, the MOU "may not become effective unless approved by the Legislature"].)

Legislative permission was obtained with the passage of Senate Bill 183, codified in section 19816.21, which provides in pertinent part: "(a) Notwithstanding Sections 18717 and 19816.20, effective July 1, 2004, the following officers and employees, who are in the following classifications or positions on or after July 1, 2004, shall be state safety members of the Public Employees' Retirement System: [¶] (1) State employees in State Bargaining Unit 7 (Protective Services and Public Services) whose job classifications are subject to state miscellaneous membership in the Public Employees' Retirement System, unless otherwise excluded by a memorandum of understanding. [¶] (2) State employees in managerial, supervisory, or confidential positions that are related to the job classifications described in paragraph (1) and that are subject to state miscellaneous membership in the Public Employees' Retirement System, provided that [DPA] has approved their inclusion. [¶] (3) Officers and employees of the executive branch of state government who are not members of the civil service and who are in positions that are related to the job classifications described in paragraph (1) and that are subject to state miscellaneous membership in the Public Employees' Retirement System, provided that [DPA] has approved their

to emergency situations and provide a level of service to the public such that the safety of the public and of property is not jeopardized. [¶] (d) For classes or positions that are found to meet this criteria, [DPA] may agree to provide safety membership by a memorandum of understanding reached pursuant to Section 3517.5 if the affected employees are subject to collective bargaining . . . [DPA] shall notify the retirement system of its determination, as prescribed in Section 20405.1."

[3] Section 3517.5 provides: "If agreement is reached between the Governor and the recognized employee organization, they shall jointly prepare a written memorandum of such understanding which shall be presented, when appropriate, to the Legislature for determination."

[4] Section 20405.1 provides in pertinent part: "(a) . . . state safety members shall . . . include officers and employees whose classifications or positions are found to meet the state safety criteria prescribed in Section 19816.20, provided the [DPA] agrees to their inclusion . . . . [¶] (b) [DPA] shall notify the [state] as new classes or positions become eligible for safety membership, as specified in subdivision (a) . . . ."

inclusion. [¶] (b) [DPA] shall notify the Public Employees' Retirement System of the classes or positions that become subject to state safety membership under this section, as prescribed in Section 20405.1." (Stats. 2002, ch. 56, § 1, p. 539.)

The Legislature also made the following amendments (underscored) to section 20405.1: "Notwithstanding Section 20405, this section shall apply to state employees in state bargaining units that have agreed to these provisions in a memorandum of understanding between the state employer and the recognized employee organization, as defined in Section 3513, state employees who are excluded from the definition of 'state employee' by subdivision (c) of Section 3513, and officers or employees of the executive branch of state government who are not members of the civil service. [¶] (a) On and after the effective date of this section, state safety members shall also include officers and employees whose classifications or positions are found to meet the state safety criteria prescribed in Section 19816.20, provided [DPA] agrees to their inclusion, and officers and employees whose classifications or positions have been designated as subject to state safety membership pursuant to Section 19816.21. For employees covered by a collective bargaining agreement, the effective date of safety membership shall be the date on which [DPA] and the employees' exclusive representative reach agreement by memorandum of understanding pursuant to Section 3517.5 or any later date specified in the memorandum of understanding. For employees not covered by a collective bargaining agreement, [DPA] shall determine the effective date of safety membership." (Stats. 2002, ch. 56, § 3, p. 540.)

The Legislature did not alter the language of subdivision (b) of section 20405.1, which states: "[DPA] shall notify the [State Personnel Board] as new classes or positions become eligible for state safety membership, as specified in subdivision (a), and specify how service prior to the effective date shall be credited."

### C

Although the statutory scheme allowed DPA to specify how service prior to the effective date of the collective bargaining agreement shall be credited, the DPA/CSLEA agreement is silent on that matter. And the Legislature's approval of the agreement does not clarify the question. Section 19816.21 simply directs DPA to notify the California Public Employees' Retirement System (CalPERS) of new safety classes as prescribed in section 20405.1, which also directs DPA to notify CalPERS when new safety classes are added and to "specify how service prior to the effective date shall be credited." (§§ 19816.21, subd. (b), 20405.1, subd. (b).)

Nevertheless, in October 2002, after Senate Bill 183 was enacted, DPA's retirement policy director prepared a question and answer sheet for CSLEA to distribute to its members regarding the new safety member benefit. It posed the question, "Is my past service going to be upgraded to State Safety retirement?" The answer was, "All of your past State service in those positions recognized for reclassification that are subject to Bargaining Unit 7 will be changed to the State safety retirement classification if you continue employment in a position subject to reclassification as of July 1, 2004."

However, prior to the July 1, 2004 implementation date of the agreement, DPA informed CSLEA that DPA would not be crediting prior service retroactively at the enhanced rate.

CSLEA filed a grievance, claiming the state had reneged on the March 11, 2002 agreement. CSLEA asked that the matter be resolved by arbitration.

DPA refused to arbitrate, asserting that the retroactive application of safety member retirement status was not an issue arising under the contract.

The Court of Appeal, First Appellate District, rejected DPA's assertion, found that the grievance presented a contract dispute, and referred the matter to arbitration.

D

The arbitrator, Bonnie Bogue, stated the issue before her was whether DPA and CSLEA reached an agreement requiring the State to purchase all previous service credit in the reclassified positions for those employees who received safety retirement as of July 1, 2004, and, if so, whether the agreement was enforceable under the collective bargaining agreement's grievance arbitration procedure.

At the arbitration hearing, the legislative history of Senate Bill 183 and other extrinsic evidence was presented because the enabling bill was silent on whether the benefit was intended to apply retroactively to cover an employee's previous service in a classification that was being reclassified from miscellaneous member to safety member status. The legislative history does not include an express statement about whether the bill, or the contract that the bill was facilitating, was intended to apply the new safety member status retroactively or only prospectively.

According to the arbitrator, the analyses in the legislative history were based on a prospective application of the safety member agreement, without an analysis of the cost for retroactive coverage of previous service. Indeed,

the bill analyses and reports used figures taken from an actuarial analysis prepared by CalPERS that assumed the transfer from the miscellaneous to safety retirement category would be prospective—an assumption that was based on information CalPERS received from DPA. The CalPERS analysis shows that the new retirement status for Unit 7 will cost the state an additional $17.1 million each year—which the Department of Finance calculated as a "present value cost of at least" $148.4 million.

The arbitrator observed that the $17.1 million figure appeared in a May 31, 2002 draft report for consideration of the Benefits and Program Administration Committee, which specifically stated the calculation was based on CalPERS advice that the "reclassification shall only apply prospectively to service performed by members on or after July 1, 2004. Thus no past service in the state miscellaneous member category for the affected Unit 7 members will be reclassified as state safety service."

The arbitrator also noted that a "Department of Finance Bill Analysis dated May 21, 2002, stated, 'to the extent prior State miscellaneous service is transferred to State safety service, the cost of this bill would increase significantly.' " Furthermore, two retirement analyses of the costs of the new safety benefit were prepared at the request of DPA's retirement policy director. One analysis was based on an assumption that the benefit would be prospective only, and the second on the assumption that the benefit would be retrospective. According to the retirement policy director, he would not have requested the second analysis if DPA administration had not been directed him to do so.

E

The arbitrator ruled that DPA and CSLEA "reached an enforceable agreement that required the State to purchase all previous service credit, in the Miscellaneous Unit 7 positions reclassified to the State Safety category for those employees who received State Safety retirement as of July 1, 2004." She observed that the sole testimony showing any belief that the benefit was prospective only did not come from anyone who had participated in the contract negotiations, but from a CalPERS analyst charged with drafting the bill analysis for Senate Bill 183. The analyst admittedly had not received any formal notice that the benefit would be prospective only; the assumption was based on an e-mail the analyst had received from DPA's retirement policy director, stating that the benefit would be prospective only. The retirement policy director admitted he may have said this and initially assumed the benefit would be prospective only. Later, he had a retrospective evaluation prepared at the request of DPA executive staff.

The arbitrator declined to address DPA's argument that the agreement violated public policy because, before it passed Senate Bill 183, the Legislature was not told the contract would be retroactive. In her view, this was not a matter of contract interpretation and, thus, not an issue within her jurisdiction—her authority under article 6 of the MOU was limited to interpreting and enforcing the terms of the collective bargaining agreement and did not extend to making public policy determinations about legislative enactments, such as whether they were based on adequate or complete information.

The arbitrator rejected DPA's contention that, regardless of whether DPA and CSLEA had agreed that the safety member retirement benefits would be retroactive, DPA should prevail on the basis of statutory supersession because the contract required implementing legislation under the Dills Act. The arbitrator found that a report by the Department of Finance "expressly noted the possibility that the measure could be applied to cover previous service, in which case 'the cost of this bill would increase significantly.' That language shows that the possibility of retroactive application was made known to the [L]egislature when this bill was under consideration. [¶] The [L]egislature's purpose in enacting S.B. 183 was solely to codify the terms of the agreement DPA had reached. DPA entered that agreement in the exercise of its statutory authority under § 20405.1(b) to determine whether previous service in a classification that is transferred to State Safety category is subject to the enhanced benefit. There is nothing in the legislative history to show the [L]egislature intended to modify the agreement in any way. The bill was drafted to mirror the language of DPA's agreement with [CSLEA]. The fact that CalPERS provided actuarial analyses that failed to reflect accurately the Agreement DPA had negotiated cannot have the effect of modifying DPA's agreement with [CSLEA]."

F

DPA filed in the Sacramento County Superior Court a petition to vacate the arbitrator's award on the ground it violated public policy mandating full disclosure to the Legislature of the terms of the safety member retirement benefit agreement submitted for legislative approval. According to DPA, the "arbitrator violated that policy because her award gives effect to an alleged oral agreement made between CSLEA and certain DPA employees that was never disclosed to the Legislature." Emphasizing that the MOU "is silent on the critical fiscal issue of retroactive application of the enhanced retirement benefit, i.e., whether or not the affected [Unit] 7 employees' previous service in the Miscellaneous category would be reclassified at the State Safety '2.5% at 55' formula under the State Safety retirement plan," DPA asserted that the legislative history of Senate Bill 183 reflects just a "prospective actuarial valuation"; the "only mention of SB 183's retrospective application occurred

after the Legislature passed SB 183." Thus, the arbitrator in effect modified the MOU that was presented to the Legislature by making it retroactive even though (1) when enacting section 19816.21 to approve the MOU, the Legislature was not told that the agreement would be retroactive, and (2) section 19816.21 or section 20405.1 cannot be construed as authorizing DPA to unilaterally bestow retroactive safety retirement credit without legislative approval.

CSLEA countered by filing a petition to confirm the award. CSLEA acknowledged that, in referring the matter to arbitration, the Court of Appeal, First Appellate District, said that, if the arbitrator interpreted the agreement as requiring DPA to award prior service credit to Unit 7 employees, then DPA could challenge the award in superior court based on DPA's claim of statutory supersession. According to CSLEA, this statement was dicta and incorrect. Thus, CSLEA urged the superior court to confirm the arbitrator's award because it "complied with the authority granted to [the arbitrator] by the parties' contract" to " 'decide the merits of the grievance.' "

The superior court denied DPA's petition to vacate, and granted CSLEA's petition to confirm, the arbitrator's award. The court held that the fact the Legislature was presented with a specific cost analysis of prospective reclassification only was not dispositive because, by modifying subdivision (b) of section 20405.1 so that DPA could "specify how service prior to the effective date shall be credited," the Legislature must have known the reclassification of Unit 7 employees to safety member retirement status could be applied retroactively. In the court's view, to construe the statute in a manner that would not allow DPA to apply the reclassification retroactively would render subdivision (b) surplusage, contrary to rules of statutory construction.

In sum, the superior court held "SB 183 authorized DPA to credit prior service," and "[t]he arbitrator found that DPA and CSLEA agreed [prior service] would be included [in the reclassification]"; thus, the arbitrator did not exceed the authority given to her because she did not reform the parties' agreement in a manner that changed the provisions approved by the Legislature. Accordingly, the court entered judgment confirming the arbitrator's award. DPA appeals.

## DISCUSSION

### I

The scope of judicial review of arbitration awards is extremely narrow. Courts may not review the merits of the controversy, the sufficiency of the evidence supporting the award, or the validity of the arbitrator's

reasoning. (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 11 [10 Cal.Rptr.2d 183, 832 P.2d 899]; *Jordan v. Department of Motor Vehicles* (2002) 100 Cal.App.4th 431, 443 [123 Cal.Rptr.2d 122].) Indeed, with limited exceptions, "an arbitrator's decision is not generally reviewable for errors of fact or law, whether or not such error appears on the face of the award and causes substantial injustice to the parties." (*Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at p. 6; see *id.* at p. 11; see also *Jordan v. Department of Motor Vehicles, supra,* 100 Cal.App.4th at p. 443.)

A court's ability to vacate an arbitration award is limited to the reasons set forth in Code of Civil Procedure section 1286.2, subdivision (a) which, as pertinent to the present appeal, states "the court shall vacate the award if the court determines any of the following: [¶] . . . [¶] (4) The arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted."

█ In determining whether arbitrators have exceeded their powers, a court must give "substantial deference to the arbitrators' own assessments of their contractual authority . . . ." (*Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 373 [36 Cal.Rptr.2d 581, 885 P.2d 994].) However, except where "the parties 'have conferred upon the arbiter the unusual power of determining his own jurisdiction' [citation], the courts retain the ultimate authority to overturn awards as beyond the arbitrator's powers, whether for an unauthorized remedy or decision on an unsubmitted issue." (*Id.* at p. 375.)

"An arbitrator exceeds his or her powers if the arbitration award violates a statutory right or otherwise violates a well-defined public policy." (*Department of Personnel Administration v. California Correctional Peace Officers Assn.* (2007) 152 Cal.App.4th 1193, 1195 [62 Cal.Rptr.3d 110]; see *Board of Education v. Round Valley Teachers Assn.* (1996) 13 Cal.4th 269, 272, 276–277 [52 Cal.Rptr.2d 115, 914 P.2d 193]; *Jordan v. Department of Motor Vehicles, supra,* 100 Cal.App.4th 431, 443; *City of Palo Alto v. Service Employees Internat. Union* (1999) 77 Cal.App.4th 327, 330, 338–340 [91 Cal.Rptr.2d 500].) And, while an arbitrator may address issues of statutory interpretation in the first instance, appellate courts are typically the final interpreters of statutory law. (*California Correctional Peace Officers Assn. v. State of California* (2006) 142 Cal.App.4th 198, 210 [47 Cal.Rptr.3d 717].)

We review de novo the superior court's decision confirming or vacating an arbitration award, while the arbitrator's award is entitled to deferential review. (*Advanced Micro Devices, Inc. v. Intel Corp., supra,* 9 Cal.4th at p. 376, fn. 9; *Jordan v. Department of Motor Vehicles, supra,* 100 Cal.App.4th at pp. 443–444.)

## II

In its challenge to the arbitration award, DPA does not claim that the arbitrator exceeded her authority in finding DPA and CSLEA agreed to retroactive application of the safety member retirement benefit. Rather, it asserts "[t]he crux of this case lies in the fact that the Legislature never unequivocally approved the Agreement."

DPA contends that, because the retroactive aspect of the agreement was not disclosed to and approved by the Legislature, the arbitrator's award violates established public policy requiring full disclosure to the Legislature of all the terms of collective bargaining agreements reached under the Dills Act.

██ Under the Dills Act, DPA is the Governor's representative for purposes of collective bargaining with representatives of recognized employee organizations concerning wages, hours, and other terms and conditions of employment. (§§ 3517, 19815.4, subd. (g).) Section 3517.5 states: "If agreement is reached between the Governor and the recognized employee organization, they shall jointly prepare a written memorandum of such understanding which shall be presented, when appropriate, to the Legislature for determination." Section 3517.6, subdivision (b) provides in part: "If any provision of the memorandum of understanding requires the expenditure of funds, those provisions of the memorandum of understanding may not become effective unless approved by the Legislature in the annual Budget Act. If any provision of the memorandum of understanding requires legislative action to permit its implementation by amendment of any section not cited above, those provisions of the memorandum of understanding may not become effective unless approved by the Legislature." ██ Sections 19816.21 and 20405.1, concerning safety member retirement benefits, are not code sections "cited above" in section 3517.6.[5]

DPA points out that the retroactive aspect of the DPA/CSLEA agreement—which was an addendum to the MOU—could not be implemented without legislative approval because it would require the significant expenditure of funds, and the conferral of safety member retirement benefits on Unit 7

---

[5] Subsequent to its action regarding the agreement at issue in this case, the Legislature enacted section 3517.63, subdivision (a), which states: "Any side letter, appendix, or other addendum to a properly ratified memorandum of understanding that requires the expenditure of two hundred fifty thousand dollars ($250,000) or more related to salary and benefits and that is not already contained in the original memorandum of understanding or the Budget Act, shall be provided by [DPA] to the Joint Legislative Budget Committee. The Joint Legislative Budget Committee shall determine within 30 days after receiving the side letter, appendix, or other addendum if it presents substantial additions that are not reasonably within the parameters of the original memorandum of understanding and thereby requires legislative action to ratify the side letter, appendix, or other addendum."

employees required the enactment and/or amendment of statutes not "cited above" within the meaning of section 3517.6.

DPA asserts that Senate Bill 183 did not confer the requisite approval; it simply gave Unit 7 employees safety member retirement benefits effective July 1, 2004, and did not expressly or implicitly approve of DPA's and CSLEA's unwritten agreement to make the benefits retroactive. Thus, DPA argues, the arbitrator exceeded her powers because the arbitration award violates a statutory right or otherwise violates a well-defined public policy.

DPA premises its argument in part on this court's decision in *Department of Personnel Administration v. California Correctional Peace Officers Assn.,* *supra,* 152 Cal.App.4th 1193 (hereafter *DPA v. CCPOA*).

In *DPA v. CCPOA,* an arbitrator found the parties had agreed to eliminate an hourly cap on a particular type of leave. However, the parties had eliminated the cap in only one portion of their MOU, neglecting to eliminate it in another portion. CCPOA alleged that the failure to eliminate the provision from both parts of the MOU was a scrivener's error. The arbitrator agreed and, even though the MOU had been ratified by the Legislature, the arbitrator reformed the written MOU to comport with the agreement reached during the parties' negotiations. Thus, the arbitrator altered the MOU provisions that had been approved by the Legislature. (*DPA v. CCPOA, supra,* 152 Cal.App.4th at pp. 1196–1199.)

This court held the arbitrator exceeded her powers by reforming the terms of the MOU in a manner that explicitly altered provisions ratified and approved by the Legislature, which violated the well-defined policy set forth in the Dills Act. (*DPA v. CCPOA, supra,* 152 Cal.App.4th at pp. 1195, 1200–1203.) A provision in the MOU that prevented alteration of the agreement by the arbitrator did not solely protect the rights of the parties to the MOU; "it also assure[d] the Legislature that the MOU it approve[d] [was] the parties' actual contract, that there [were] no off-the-record agreements to which it [was] not privy, and that the MOU [would] not be altered subsequently." (*Id.* at p. 1202; see also *Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 524 [117 Cal.Rptr.2d 220, 41 P.3d 46] [a written contract may not be reformed based on mutual mistake if doing so prejudices the rights of a third party to the contract].)

Here, DPA's and CSLEA's MOU states, "The arbitrator shall not have the power to add to, subtract from or modify this Contract. . . ." According to the arbitrator, the safety member agreement was an addendum to the MOU, which means she could not modify the terms of the safety member retirement agreement because it became part of the MOU. The arbitrator relied on

extrinsic evidence to determine that both DPA and CSLEA intended the agreement to apply retroactively to prior service credit at the time the agreement was negotiated. We must defer to this determination and accept that the arbitrator did not alter the parties' understanding of the agreement. (*Advanced Micro Devices, Inc. v. Intel Corp., supra*, 9 Cal.4th at p. 373.)

However, nothing in Senate Bill 183 or section 19816.21 indicates the Legislature approved conferring the safety member retirement status retroactively to cover prior miscellaneous member retirement service credit. Such approval is necessary under the Dills Act. (§§ 3517, 3517.5, 3517.61.) Consequently, to the extent that the arbitrator's award mandates that the agreement be enforced without unequivocal legislative approval, it violates public policy for the same reasons as in *DPA v. CCPOA, supra*, 152 Cal.App.4th 1193.

CSLEA believes that this is "a flawed and over-expansive interpretation" of *DPA v. CCPOA* because the parties in that case neglected to eliminate a contract provision due to a scrivener's error and, thus, the Legislature approved a contract that included a provision the arbitrator later deleted to conform to the intent of the contracting parties. Here, in contrast, the agreement "is silent on the point" whether the safety member retirement benefit will be retroactive. *But that is the point.*

The Legislature enacted Senate Bill 183 to effectuate an MOU that did not contain the parties' entire agreement. The arbitrator rectified this after the fact by construing the MOU as bestowing retroactive safety member retirement service credit for prior miscellaneous member service credit. That *DPA v. CCPOA* involved a deletion from the express written terms of the MOU, whereas this case involves an addition to the express written terms of the MOU, is a distinction without a difference.

Section 19816.21 was enacted to enable Unit 7 to qualify for safety member retirement benefits in accordance with the parties' MOU. Absent language in the written MOU stating the benefit would be retroactive, we cannot say that section 19816.21 was intended to do anything more than give Unit 7 members safety retirement benefits effective July 1, 2004. Stated another way, we cannot say that the Legislature approved the unwritten agreement to bestow the safety member benefits retroactively. Indeed, the arbitrator found "the enabling bill, which echoed the March 11 Agreement, was . . . silent on whether the benefit was intended to apply 'retroactively' to cover an employee's previous service in a classification that was being reclassified from Miscellaneous to State Safety."

CSLEA and the superior court appear to believe that it is sufficient the Legislature was aware the benefit *could be* conferred retroactively in light of

certain statutes and enrolled bill reports.[6] For example, an enrolled bill report by the Department of Finance, prepared in early June 2002 before the Legislature's final vote on Senate Bill 183,[7] notes the retirement benefits proposed in Senate Bill 183 would cost an additional $17.1 million each year beginning in fiscal year 2005–06, and the "total present value cost of the bill would be at least $174.3 million" plus "potentially significant administrative costs to implement the provisions of the bill." According to the bill report, these fiscal estimates were based on an assumption "that the transfer from the State miscellaneous retirement category to the State safety retirement would apply *prospectively*. This bill would allow DPA to determine if prior service in the State miscellaneous retirement category would be credited to the State safety retirement category. If DPA would allow State miscellaneous service credit to be transferred to State safety service credit, *the cost of this bill would increase significantly*." (Italics added.)

However, the mere fact the Legislature was aware that DPA *might* determine to credit the miscellaneous service as safety service does not mean that the Legislature was aware the parties' negotiated MOU actually included an unwritten agreement for retroactivity. In fact, the quoted bill report language intimates the matter had not yet been decided.

As for the statement that the bill would allow DPA to determine whether to credit prior miscellaneous member service to the safety member service, this presumably is a reference to DPA's statutory authority under sections 20068, subdivision (g) and 20405.1, subdivision (b). Section 20068, subdivision (g) provides: " 'State safety service,' with respect to a member who becomes a state safety member pursuant to subdivision (b) of Section 20405.1, shall also include service rendered in an employment in which persons have since become state safety members, as determined by the Department of Personnel Administration pursuant to that section."[8] Section 20405.1, subdivision (b)

---

[6] DPA argues that enrolled bill reports cannot reflect the intent of the Legislature because the executive branch prepares them after the bill has passed and is enrolled. But, according to the California Supreme Court, enrolled bill reports, prepared by a responsible agency contemporaneously with passage and before signing, are instructive on matters of legislative intent. (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 934, fn. 19 [22 Cal.Rptr.3d 530, 102 P.3d 915]; accord, *Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 50, fn. 16 [105 Cal.Rptr.3d 181, 224 P.3d 920].) We are obligated to follow these decisions. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]; *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 40 [34 Cal.Rptr.3d 520] [disagreed with *Elsner v. Uveges* but followed it due to stare decisis].)

[7] Senate Bill 183 was passed by the Assembly on June 13, 2002, and by the Senate on June 17, 2002, and was signed by Governor Davis on June 19, 2002.

[8] Contrast the language of subdivision (g) with other subdivisions of section 20068 indicating that the Legislature knows how to state whether state safety benefits would or would not be retroactive: "(a) 'State safety service' means service rendered as a state safety member

states: "The department shall notify the board as new classes or positions become eligible for state safety membership, . . . and specify how service prior to the effective date shall be credited."

■ No one disputes that sections 20068 and 20405.1 delegate to DPA the authority to negotiate the safety member retirement benefit and how to treat prior miscellaneous member service as part of the collective bargaining process. But this delegation of authority cannot be construed to negate the Dills Act requirement that a collective bargaining agreement involving the expenditure of money must be submitted to the Legislature for its approval or disapproval. (*California Assn. of Professional Scientists v. Schwarzenegger* (2006) 137 Cal.App.4th 371, 383–384 [40 Cal.Rptr.3d 354] [Legislature's sovereign power governs all contracts subject to its jurisdiction and remains intact unless surrendered in unmistakable terms].) This requirement necessarily includes the obligation to present the Legislature with a fiscal analysis of the cost of the agreement. (See § 7507, subd. (b)(1) ["before authorizing changes in public retirement plan benefits or other postemployment benefits," the Legislature shall have a "statement of [their] actuarial impact upon future annual costs, including normal cost and any additional accrued liability"].)

Furthermore, CSLEA points to no evidence or rules of statutory construction demonstrating that any portion of Senate Bill 183 permits DPA to determine the retroactivity of service credit without complying with the Dills Act once a determination is made.[9]

---

only while receiving compensation for that service, except as provided in Article 4 (commencing with Section 20990) of Chapter 11. It also includes service rendered in an employment in which persons have since become state safety members and service rendered prior to April 1, 1973, and falling within the definition of warden, forestry, and law enforcement service under this chapter prior to April 1, 1973. 'State safety service' pursuant to this subdivision does not include service as an investigator prior to April 1, 1973, within the Department of Justice of persons who prior to April 1, 1973, were classed as miscellaneous members. [¶] (b) 'State safety service' with respect to a member who becomes a state safety member pursuant to Section 20405 shall also include service prior to the date on which he or she becomes a state safety member as an officer or employee of the Board of Prison Terms, Department of Corrections, Prison Industry Authority, or the Department of the Youth Authority. [¶] (c) 'State safety service' with respect to a member who becomes a state safety member pursuant to Sections 20409 and 20410 shall also include service in a class specified in these sections or service pursuant to subdivision (a), prior to September 27, 1982. [¶] (d) 'State safety service,' with respect to a member who becomes a state safety member pursuant to Sections 20414 and 20415, shall also include service prior to September 22, 1982, as an officer or employee of the Department of Parks and Recreation or the Military Department. [¶] (e) 'State safety service' does not include service in classes specified in Section 20407 prior to January 1, 1989. [¶] (f) 'State safety service' does not include service in classes specified in Section 20408 prior to January 1, 1990."

[9] It could be argued, but was not in this case, that whether to credit prior service under the enhanced safety member retirement category is a *fundamental* legislative policy decision that cannot be delegated to DPA absent guidance on how to effectuate this policy decision. (See

CSLEA asserts that the Legislature necessarily approved the retroactive provision of the agreement because the Legislature was "aware of its own prior history (testified to by many witnesses at arbitration) of almost always crediting prior service when retirement categories are upgraded or wholesale classification changes are made." But those witnesses were not members of the Legislature and did not discuss anything pertaining to the Legislature's awareness of its own prior history. The witnesses, representatives of CSLEA and DPA, simply discussed their *assumption* that the benefits would be retroactive, and the fact that, during negotiations, no one ever mentioned that the benefits would be prospective. The matter was not discussed one way or the other. In any event, that such benefits are "almost always" transferred retroactively does not mean it is necessarily so in all cases, including this one.

 Simply stated, it is not sufficient that the Legislature was aware DPA could agree with CSLEA to make the safety member retirement credit retroactive. The Legislature had to (1) be informed explicitly that DPA and CSLEA did enter into such an agreement, (2) be provided with a fiscal analysis of the cost of retroactive application of the agreement, and (3) with said knowledge, vote to approve or disapprove the agreement and expenditure.

Because Senate Bill 183 and the materials provided to the Legislature regarding the bill did not state that the reclassification would be applied retroactively and did not contain a fiscal analysis of the cost of the retroactive application of safety member status for all employees in Unit 7,[10] we must vacate that portion of the arbitration award as violating the public policy embodied in the Dills Act.

---

*People v. Wright* (1982) 30 Cal.3d 705, 712–713 [180 Cal.Rptr. 196, 639 P.2d 267] ["An unconstitutional delegation of legislative power occurs when the Legislature confers upon an administrative agency unrestricted authority to make fundamental policy decisions. [Citations.] 'This doctrine rests upon the premise that the legislative body must itself effectively resolve the truly fundamental issues. It cannot escape responsibility by explicitly delegating that function to others or by failing to establish an effective mechanism to assure the proper implementation of its policy decisions.' [Citation.] [¶] The doctrine prohibiting delegations of legislative power does not invalidate reasonable grants of power to an administrative agency, when suitable safeguards are established to guide the power's use and to protect against misuse. [Citations.] The Legislature must make the fundamental policy determinations, but after declaring the legislative goals and establishing a yardstick guiding the administrator, it may authorize the administrator to adopt rules and regulations to promote the purposes of the legislation and to carry it into effect. [Citations.] Moreover, standards for administrative application of a statute need not be expressly set forth; they may be implied by the statutory purpose. [Citations.]"].)

[10] DPA asserts that retroactive application of safety member status to prior miscellaneous member service of all Unit 7 employees would cost an estimated $39.6 million. However, an actuarial cost analysis based upon the reclassification of approximately 4,000 Unit 7 members estimated that, if the benefit were applied retroactively, "the total increase in State contribution

## DISPOSITION

The judgment confirming the arbitration award is reversed to the extent that it mandates the state to reclassify all previous miscellaneous service credit by members employed in Unit 7 as of July 1, 2004, to safety member status without first obtaining Legislative approval of this portion of the parties' agreement. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

Nicholson, Acting P. J., and Butz, J., concurred.

Respondent's petition for review by the Supreme Court was denied April 27, 2011, S191200.

would have been about $20.3 million." In any event, CSLEA conceded at oral argument in this court that, applying the reclassification retroactively to prior service credit, would significantly increase the cost of implementing the agreement.