[No. G040486. Fourth Dist., Div. Three. Oct. 18, 2010.]

RUTH E. ABERS et al., Plaintiffs and Appellants, v.
CHRISTINE MARIE ROUNSAVELL, as Trustee, etc., et al., Defendants
and Appellants.

COUNSEL

Baker & Baker, William E. Baker, Jr., Robert N. Tan; Snell & Wilmer, Richard A. Derevan, Steven A. McHolm and Todd E. Lundell for Plaintiffs and Appellants.

Palmieri, Tyler, Wiener, Wilhelm & Waldron, Michael H. Leifer, Norman J. Rodich, Erin Balsara; Bullard, Brown & Beal and Timothy W. Brown for Defendants and Appellants.

OPINION

**RYLAARSDAM, Acting P. J.**—These appeals concern a Santa Ana condominium project that falls somewhere between owning a home and renting it. Plaintiffs (the homeowners) purchased a leasehold interest in their individual homes in a 150-unit condominium project. Each has been assigned a single-unit ground lease with lessors, the trustees of a family trust.

The ground leases are for a long term (75 years), with a rent adjustment clause for increasing the rents after 30 years. The rent adjustment clauses call for reassessing the ground rent based on a percentage of the appraised value of the "leased land." It is now time to adjust the ground rents.

What meaning should be given for the term "leased land," as used in the 150 single-unit leases? The homeowners contend that we should look to the four corners of each ground lease, which basically describes the "leased land" as the individual condominium unit, as well as a small fractional share of part of the common areas. The trustees urge us to consider extrinsic evidence to expand the definition of "leased land" to include the entire condominium acreage, including the land underneath the complex's recreation center, which is the subject of a *separate* ground lease with the homeowners association.

Like the trial court, we have examined the trustees' proffered interpretation of the ground leases, and the related extrinsic evidence. Unlike the trial court, we find no ambiguity, either latent or patent. Because none of the language in the single-unit leases is reasonably susceptible to the trustees' suggested interpretation, we reverse the judgment for the trustees.

Our decision for the homeowners on the principal appeal moots the trustees' appeal from the postjudgment order denying attorney fees.

FACTS AND PROCEDURAL HISTORY

1. *The Phased Development of the Condominium Project (1969–1975)*

    a.  *The Warner Lease and Assignment to Warmington*

The trustees administer the John and Vera B. Rohrs Trust, which owns 18½ acres of land in Santa Ana on which the Shady Hollow condominium project was developed in the mid 1970's.

The trustees initially entered into a unitary lease in 1969 to lease 18½ acres of undeveloped property to Warner Enterprises for a 55-year term for apartments. The initial ground rent was based on a percentage of the fair market value of the undivided parcel.

Warner never built the apartments. Four years later, with the trustees' consent, Warner assigned its interest in the ground lease to Warmington Development, which instead decided to build condominiums.

In March 1974, Warmington recorded a parcel map for the 18½ acres. The parcel map envisioned the phased development of a 150-unit condominium project on three separate parcels: (1) parcel one, for 83 condominiums, to be constructed in the first phase; (2) parcel two, for a recreation center (a clubhouse and swimming pool); and (3) parcel three, for an additional 67 condominium units, to be constructed in the second phase.

The trustees and Warmington decided to structure the transaction as ground leases, rather than a fee sale. Warmington would construct the condominium units, and arrange for them to be placed on the residential real estate market. The home buyers would never acquire fee ownership in the condominium units; instead they would accept an assignment of one of 150 separate single-unit ground leases, which were to be prepared and executed by the trustees and Warmington. These 150 leases would supersede the unitary Warner lease.

    b.  *Parcel One Ground Leases*

The condominium plan for the parcel one units was recorded in June 1974. The leases followed the same exemplar, with an express integration clause "that there are no verbal agreements, representations, warranties or other understandings affecting the same." They defined the "leased land" in each single-unit lease as the specified condominium unit, and an undivided 1/83 interest as a tenant in common in the parcel one common areas. Running for

a 75-year term ending on December 31, 2049, they provided for a monthly ground rent for the "leased land" of $42 for the first 30 years, for an annual total of $504.

The rent adjustment clause was contained in the same paragraph (par. 22) of each of the initial 83 leases. Midway through the 30th year of the lease, the ground rent for the "leased land" would be adjusted to 8 percent of the then current fair market value, exclusive of all land improvements. Were the parties unable to agree upon the adjusted rent, the rent would be determined by three arbitrators, two of whom would be individually selected by the parties. New rent adjustments would apply for succeeding 10-year periods through the end of the lease.

On October 18, 1974, the trustees and Warmington executed individual single-unit leases for the 83 parcel one units. The same day, they formally terminated the Warner lease insofar as it affected parcel one.

As the units were sold, each purchaser signed an assignment for the particular described condominium. The assignment contained the same legal description of the leased property as the ground lease to which it pertained. The assignments were signed by the individual purchasers, as the assignees, and by a Warmington representative, as the assignor.

c. *Parcel Two Ground Lease (Recreation Center)*

The trustees and Warmington created a separate ground lease for the recreation center on parcel two. This ground lease also ran for a 75-year term through December 31, 2049, but there was no rent adjustment clause. Instead, the lease provided for a nominal rent of $1 for the entire term, with no rent increase.

The trustees and Warmington executed the parcel two ground lease on October 18, 1974, the same day they executed the parcel one ground leases, and the same day they terminated the Warner lease with respect to parcel one and parcel two.

Warmington recorded a declaration of covenants, conditions and restrictions (CC&R's) for the Shady Hollow Homeowners Association (HOA). These documents governed the 83 units on parcel one, and the recreation center on parcel two. In November 1974, Warmington assigned the parcel two ground lease to the HOA. The trustees agreed to this assignment.

### d. *Parcel Three Ground Leases*

The project's second phase consisted of an additional 67 condominium units to be constructed on parcel three. In October 1974, Warmington recorded the parcel three condominium plan, and began development shortly thereafter.

The parcel three ground leases were substantially similar to the parcel one ground leases, including a rent adjustment clause, also denominated as paragraph 22. Here, the lessees acquired a leasehold interest within parcel three, with the leases defining the "leased land" as a specified condominium unit, as well as an undivided 1/67 interest as a tenant in common in the parcel three common area. The leases contained the same termination date (Dec. 31, 2049), but the monthly ground rent for the first 30 years was slightly higher, at $44 per month, for an annual total of $528.

Each of the 67 parcel three ground leases initially was negotiated and signed by the trustees and Warmington. In May 1975, with the division of the Warner lease into separate condominium leases, the trustees and Warmington formally cancelled the Warner lease. At the same time, Warmington extended the CC&R's to cover the parcel three units.

Like the parcel one purchasers, the parcel three purchasers bought leasehold interests in their units, not fee interests. As each unit was sold, Warmington assigned its interest in the applicable single-unit lease to the purchaser of the corresponding leasehold condominium.

## 2. *Market Readjustment and the Declaratory Relief Lawsuit*

The rent for the ground leases of 81 of the 83 parcel one units was set to adjust in April 2005. The rent for all 67 of the parcel three units and the remaining two parcel one units was set to adjust in May 2006.

In early 2005, the trustees advised the homeowners that the ground rent for each unit would increase from $42 to $44 per month to $2,000 per month. The homeowners objected, and the trustees demanded arbitration.

The homeowners filed this action against the trustees, seeking a judicial determination about the definition of "leased land" in the single-unit ground leases. The operative complaint is the second amended complaint.

The court determined the arbitration clauses of the ground leases provided for arbitration to determine the fair market value of the leased land, but did not cover other legal issues regarding interpretation of the leases.

On the trustees' motion, the court granted an interim rent increase to reduce the amount of back rent the homeowners ultimately would pay, thereby "keep[ing] the plaintiffs, or as many of them as possible, in their homes," and avoiding default. In *Baxley v. Brown* (Jan. 17, 2008, G038427) (nonpub. opn.), we reversed the pendente lite order as an invalid preliminary injunction.

### 3. *Trial and Judgment*

Following remand, the case proceeded to a court trial. The trial court declined to consider any testimony, but received numerous exhibits and heard two days of legal argument, based upon the documentary evidence, to "come up with a conclusion as to whether or not there is any initial ambiguity that would lead to the necessity of hearing any extrinsic evidence."

In its tentative decision, the court determined "that the term 'leased land' is not vague, uncertain or ambiguous, nor is it erroneous or misplaced. The meaning of the term 'leased land', as with regard to all other terms of the leases, must be discerned not just from the terms of the Leases themselves, but from all of the other documents which made up the entirety of the transaction. [The homeowners] just didn't lease a plot of land; they leased a plot of land that was part of a condominium community, fully improved, consisting of 150 units, plus common areas, with rights and obligations attached. The leased land to be valued therefore is the entire [*sic*] of the land leased from [the trustees], not just the value of the tenant's interest."

The court entered judgment in favor of the trustees and against the homeowners. In adopting instructions for the arbitrators, the court construed the term "leased land" as used in each of the first phase ground leases to mean the *entire* 18½-acre parcel of land on which the condominium complex was located (including parcel two and parcel three), with the rental rate determined by valuing the leased land as of April 18, 2005, multiplied by 8 percent and divided by 150. The court further determined that the 18½-acre parcel would be assessed at its "highest and best use," to mean "the reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value." The court applied the same formula to each of the phase three ground leases, with a valuation date set for May 1, 2006.

The trustees thereupon sought statutory attorney fees as prevailing parties on an action to enforce the CC&R's. (Civ. Code, § 1354, subd. (c).) The court denied the motion because the statute appeared to apply only in litigation between homeowners associations and their members.

The homeowners have appealed from the declaratory judgment in favor of the trustees, and the trustees have appealed from the postjudgment order on attorney fees.

DISCUSSION

1. *Principles of Contract Interpretation and Standard of Review*

Much has been written about how to interpret a writing, and whether parol evidence may be used to add to, explain or vary it. (See *Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384 [46 Cal.Rptr.3d 668, 139 P.3d 56] (*Dore*); *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641]; *Masterson v. Sine* (1968) 68 Cal.2d 222 [65 Cal.Rptr. 545, 436 P.2d 561]; *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944 [135 Cal.Rptr.2d 505] (*Founding Members*); see also Code Civ. Proc., § 1856.)

■ California finds meaning in contractual language in its applications. To avoid future disputes and to provide predictability and stability to transactions, courts attempt to interpret the parties' intentions from the writing alone, if possible. (*Founding Members, supra*, 109 Cal.App.4th at p. 955; see Civ. Code, § 1636; Code Civ. Proc., § 1856.) This is particularly true with documents relating to real estate transactions, which, when recorded, are intended to provide public notice and promote public reliance on their facial meaning.

■ Ambiguities arise when contractual language reasonably may be susceptible to more than one interpretation based upon the offered evidence regarding the material facts. (*Dore, supra*, 39 Cal.4th at p. 391.) Under these circumstances, trial judges, acting as gatekeepers, may take a "preliminary look" at proffered extrinsic evidence to determine ambiguity, because written words may have special meanings to the contracting parties that are not apparent on the face of the document itself. (*ACL Technologies, Inc. v. Northbrook Property & Casualty Ins. Co.* (1993) 17 Cal.App.4th 1773, 1793 [22 Cal.Rptr.2d 206] [". . . courts should allow parol evidence to explain *special* meanings which the individual parties to a contract may have given certain words"].)

An agreement is not ambiguous merely because the parties (or judges) disagree about its meaning. Taken in context, words still matter. As Justice Baxter has pointed out, "written agreements whose language appears clear in the context of the parties' dispute are not open to claims of 'latent' ambiguity." (*Dore, supra*, 39 Cal.4th at p. 396 (conc. opn. of Baxter, J.).)

■ The question whether proffered extrinsic evidence renders a contract reasonably susceptible to ambiguity is a judicial function to be decided initially by the trial court, and independently by the appellate court. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839] (*Parsons*).) "The threshold issue of whether to admit the extrinsic evidence—that is, whether the contract is reasonably susceptible to the interpretation urged—is a question of law subject to de novo review." (*Founding Members, supra*, 109 Cal.App.4th at p. 955.)

The trustees erroneously contend that we are bound by the trial court's legal interpretation of the meaning of the ground leases. While we defer to a trial court's resolution of factual disputes, including factually disputed extrinsic evidence, we independently determine whether the contract is reasonably susceptible to different meanings. " '[C]onflicting inferences . . . , far from relieving the appellate court of the responsibility of interpretation, signalize[] the necessity of its assuming that responsibility.' " (*Parsons, supra*, 62 Cal.2d at p. 866, fn. 2.) If there is no patent or latent ambiguity, " 'the case is over.' " (*Dore, supra*, 39 Cal.4th at p. 393 [affirming summary judgment regarding plain meaning of "at will" provision in employment contract; employee's extrinsic evidence, even if credited, does not support inference that he reasonably construed the contract to require termination for cause].)

## 2. *Plain Meaning of "Leased Land" in the Ground Leases*

We have closely examined the definition of "leased land" in the three different sets of ground leases at issue here, considering them in the context of the extrinsic evidence offered by the trustees and admitted into evidence below. Because we see no conflict in the extrinsic evidence here, and no issues of credibility, we give the plain language in each of the ground leases its plain meaning, and apply the facially clear language as it has been drafted. There is no contextual ambiguity.

Paragraph 1 of the single-unit ground leases for the parcel one units describes the "property leased," which, following such description, is "hereinafter referred to as the 'leased land' " for purposes of the remainder of the ground lease, including the rent adjustment clause in paragraph 22. The paragraph contains a legal description of "that certain condominium" that is the subject of the lease, as well as an undivided 1/83 interest in the parcel one common area.

There is no other reference in any of the parcel one ground leases to any other parcel in the 18½-acre property owned by the trustees. There is no reference to either parcel two or parcel three. The recreation center lease has its own definitions of "property leased" and "leased land" with a different

legal description. In like fashion, the parcel three ground leases only speak about parcel three, saying nothing about any leasehold interest in either parcel one or parcel two.

This cannot be an oversight. Looking at all of the contractual transactions in context (including the CC&R's, the annexation document and the Warner lease termination documents) the trustees and Warmington clearly knew how to differentiate among the three parcels comprising the entire 18½ acres. The Warner lease termination document expressly recites the parties' intent to fractionalize the Warner lease into 150 single-unit condominium leases (to be assigned to individual homeowners) "*and* one common area lot lease [covering the recreation center parcel] to be assigned to [the HOA] . . . ." (Italics added.)

■ There is a reason for recording critical documents concerning real property conveyances, like deeds and ground leases, which "announce[] interests in land to the world." (*City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 262 [52 Cal.Rptr.2d 82, 914 P.2d 160] (conc. & dis. opn. of Mosk, J.).) Interpreting a recorded document by its four corners "provides public notice that successors in interest and innocent third parties may need to rely on for centuries. For that reason, whatever the parties may have intended, it is the language used in the resulting conveyance that must govern 'if possible . . . .' " (*Id.* at p. 253 (conc. & dis. opn. of Mosk, J.).)

3. *Warner Lease Documents and Escrow Instructions*

None of the collateral documents cited by the trustees mentions dividing the valuation of the 18½-acre condominium project by 150 to make a rent adjustment. We see nothing in the extrinsic evidence to sustain the trustees' argument that the term "leased land" in the single-unit ground leases refers to all of the land underlying the Shady Hollow Development.

The trustees emphasize language in a single-page letter agreement, dated September 16, 1974, that "the rate of rental provided under the [150] individual residential leases shall thereafter apply to *all* the property previously subject to the undivided lease . . . ." (Italics added.) According to the trustees, this document demonstrates "the intent of the original contracting parties that the 150 Leases would supplant the one Warner Lease, with the rental obligation and the cumulative rental amount being the same."

The trustees' singular reliance on this document to create an ambiguity is misplaced. The critical document is the lease termination agreement, dated October 18, 1974, and recorded on October 21, 1974, which incorporates the September 16 letter by reference. The lease termination agreement emphasized the trustees and Warmington's intent "to fractionalize said Lease into

one hundred fifty separate residential condominium leases (the 'condominium leases') to be assigned to the purchasers of condominium units to be developed on the Property, *and* one common area lot lease to be assigned to Shady Hollow Homeowners Association." (Italics added.) In November 1974, the trustees consented to assign the parcel two lease for the recreation center, including its rent terms, from Warmington to the HOA.

Had the trustees desired to link the rent adjustment clause to the entire 18½-acre property, with a single appraisal, they would have either drafted a so-called "tower ground lease" to give the HOA an undivided leasehold interest in all of the property or, alternatively, drafted the 150 single-unit condominium leases to give the individual homeowners a fractional 1/150 share in all of the common property, including parcel two for the recreation center. In their absence, we cannot judicially rewrite the ground leases decades after the fact to say what the trustees now wish they would have said.

Equally unavailing is the trustees' reliance on statements in the escrow instructions for the initial condominium sales in 1975 and 1976. The escrow instructions informed each individual buyer that he or she was purchasing a condominium leasehold estate, subject to a ground lease with the trustees, to be assigned to the buyer at the close of escrow. The escrow instructions contained the same legal description of the property as in the ground lease (including the buyer's undivided 1/83 or 1/67 interest in the common areas of either parcel one or parcel three), calling upon the buyer to acknowledge his or her understanding "that there will be leasehold rent he will pay proportionately with all owners of 150 units/lots payable at $42.00 monthly in advance."

We do not see how the above quoted language in the escrow instructions affects the rent adjustment provisions in the individual ground leases. The escrow instructions never alluded to any buyer's fractional leasehold interest in parcel two, nor to any buyer's existing or future obligation to pay rent on any portion of parcel two. Moreover, the escrow instructions spoke only to the initial rent in the leases (as a fixed dollar amount), not about how future rent adjustments would be calculated.

### 4.   *CC&R's, Bylaws and the Question of Use*

The trustees conflate the homeowners' right to *use* the recreation center and the common area on which the recreation center is located with obligation to *pay* the trustees rent for such use. They argue, "Each condominium also comes with certain rights and privileges, including the rights of use and occupancy of . . . the pool and recreation area . . . ." "In order to facilitate the

operation of the Shady Hollow common interest development, the formative documents must be read to provide that each unit has an equal interest in the common areas."

The ground lease for the recreation center parcel, not the CC&R's and not the condominium projects bylaws, legally defines who is obligated to pay for such occupancy and use. The trustees and Warmington executed this agreement in October 1974, and the trustees further agreed a month later to assign this bundle of rights and obligations to the HOA. Having negotiated a lease for this parcel for valuable consideration from Warmington and then, by assignment, from the HOA, the trustees cannot double dip and collect additional rent from the individual homeowners.

■ The trustees' reliance on California statutory law concerning condominium developments is misconceived. (See Davis-Stirling Common Interest Development Act, Civ. Code, § 1350 et seq.) Under California law, individual condominium owners own the common areas of the condominium project as tenants in common, in equal shares, one for each unit or lot where "the common areas are owned by the owners of the separate interests . . . ." (Civ. Code, § 1362.) Courts readily recognize that the legal interests of individual condominium owners are not coterminous with the legal interests of homeowners associations. (See, e.g., *Gantman v. United Pacific Ins. Co.* (1991) 232 Cal.App.3d 1560 [284 Cal.Rptr. 188] [property insurer for condominium common areas owes policy obligations only to homeowners association, not to unit owners].)

Here, parcel two on which the recreation center sits is owned by the trustees and leased, by assignment, to the HOA. Only the HOA is an assignee of parcel two, not the homeowners. At most, depending upon whether they bought a unit in the first or second phase of the project, the homeowners have a fractional 1/83 interest in the common areas of parcel one or a fractional 1/67 interest in the common areas of parcel three.

The homeowners' right under the CC&R's to use the clubhouse and the swimming pool in the project does not equate with an obligation to pay the trustees ground rent (or subsequent rent adjustments) for parcel two upon which those facilities are located. This obligation rests with the HOA.

5. *Postcontract Extrinsic Evidence*

The trustees argue that the homeowners' own interpretation of the rent adjustment clauses decades after the leases' execution supports the trustees' proposed methodology to cover all 18½ acres. Citing to December 1996 minutes purportedly from a subcommittee of the HOA, the trustees

emphasize the following "observation": "Fees are set at 8% of newly appraised value divided by 150 sub-lessees (i.e. homeowners)." The trustees also rely on evidence regarding the HOA's unsuccessful efforts to purchase the land beneath the entire project, including the recreation center parcel.

This postcontract evidence does not establish any ambiguities in the ground lease provisions, let alone resolve them. Since the rent adjustment clause was nearly a decade from taking effect, the proffered evidence has no bearing upon the parties' course of performance. According to the homeowners' evidence, this HOA board, based on legal advice obtained during the 1990's, determined that "the leases were between each owner and the lessor. The Association had no negotiating authority between the two parties." At most, we are told, this purported HOA subcommittee was a "mere . . . voluntary committee of interested homeowners" who made their observations based exclusively upon communications from the trustees' attorney, without independent analysis. "I assumed that since [the trustees' counsel] was a lawyer, his interpretation of the Lease must have been correct." The trustees cannot bootstrap their own lawyers' aggressive advocacy into independent evidence of how it was understood, interpreted or performed by both sides.

### 6. *Practical Impacts*

The trustees contend that we should find an ambiguity in the ground leases because otherwise "after the rental adjustment, *no one* would be paying rent on Common Area B [(i.e., the parcel two for the recreation center)]—yet another absurd result that no one ever intended." (Original italics.) They encourage us to construe the definition of "leased property" expansively to include parcel two to avoid an "unfair and unintended windfall for [the homeowners] and a forfeiture for the [trustees]."

The trustees complain that homeowners have enjoyed a fixed land rent set at 1974-era levels for over 30 years, and that the trustees, in turn, have been receiving below-market ground rents for decades. Because the homeowners' leasehold interests, under a four-corners interpretation, are "unmarketable and valueless," the trustees imply that they never will be able to impose rent increases over the life of the ground leases.

■ Our task is to construe the ground leases as they are, not as the trustees want them to be. "We do not have the power to create for the parties a contract that they did not make and cannot insert language that one party now wishes were there." (*Vons Companies, Inc. v. United States Fire Ins. Co.* (2000) 78 Cal.App.4th 52, 59 [92 Cal.Rptr.2d 597].) Courts may find an implied term in a contract only under "limited circumstances" on grounds of " 'obvious necessity' " "where the term is 'indispensable to effectuate the

expressed intention of the parties.' " (*Ben-Zvi v. Edmar Co.* (1995) 40 Cal.App.4th 468, 473 [47 Cal.Rptr.2d 12] [declining to imply additional requirements into exclusive distributorship to give manufacturer flexibility to meet changing market conditions].)

We find the trustees' proposed reinterpretation neither indispensable, nor a matter of obvious necessity. First, as the homeowners point out, there is no evidence in the record about the practical impact of any proposed valuation method. "[I]t is a big 'if' whether there will be [a] rent increase, and if so, how much, under [the homeowners'] formula." We leave further consideration of the actual assessment of appraisal to the ongoing appraisal process.

■ Second, far from being an "absurd" result, paying $1 for a 75-year ground lease for the recreation center parcel, whose improvements (a clubhouse, swimming pool and recreation center) would revert back to the trustees at the conclusion of the lease term, is precisely what the trustees negotiated in their arm's-length transaction with Warmington. The trustees never have sought to disavow the lease for inadequate consideration, nor have they argued that it is otherwise unenforceable. "It is a matter of common knowledge that where a consideration of one dollar is mentioned in a contract, other considerations usually pass between the parties to the agreement. A consideration of one dollar is ordinarily sufficient to support a contract at law." (*Chrisman v. Southern Cal. Edison Co.* (1927) 83 Cal.App. 249, 254 [256 P. 618].) "Adequacy of consideration need not be proved where the defendant has already accepted the consideration." (*Beab, Inc. v. First Western Bank & Tr. Co.* (1962) 204 Cal.App.2d 680, 685 [22 Cal.Rptr. 583].)

Third and last, nothing in any single-unit ground lease (itself a diminishing asset) guarantees a substantial monetary benefit to the trustees from rent increases. Indeed, the rent adjustment clauses in the ground leases recognize that there may be no increase at all during the term of the lease. That is why they prohibit the ground rent from being adjusted below the initial rate: "[A]nd after any such adjustment of rental Lessee shall pay to Lessor such rental as so adjusted during the period applicable thereto at the times and in the manner hereinabove provided; provided, however, in no event shall the rental as so adjusted be less than the initial rental provided above."

The trustees cannot be heard to complain that the ground leases for the individual condominium units, and for the recreation center function, as drafted. The plain language in the recorded deeds gives rise to the reasonably justified expectation that the rent adjustment .clauses will be limited to the fair market value of the leaseholds for the individual condominium units, rather than fair market value of the entire 18½ acres. Judicially

reforming these provisions more than 30 years later would make us accomplices to a classic bait-and-switch operation.

### 7. *Other Definitions*

The trial court's erroneous interpretation of "leased land" may have affected its definition of other terms in the declaratory judgment. For example, the judgment separately defines "as improved" to "mean that the unimproved land (previously a citrus ranch) has been approved for development for a 150 condominium unit single-family attached home development with a common area and common facilities, such as a pool and clubhouse." The homeowners have expressed their concern that the arbitrators, in making their valuations, could misconstrue such definitions to include parcel two for the recreation center within their valuations. As they explain, "these definitions . . . assume that the *entire* parcel is what is being valued. But . . . 'leased land' is limited to an individual condominium and a fractional interest in a part of the [entire] parcel . . . ." (Original italics.)

On remand, the trial court should make any appropriate clarifications to ensure that the homeowners' rent is not adjusted to include property they do not lease.

### 8. *Moot Contentions*

Because the definition of "leased land" is clear and unambiguous and excludes parcel two, the homeowners have no need to reform the ground leases based on unilateral mistake. This moots their appeal from the judgment on the pleadings on their cause of action for unilateral mistake.

Our holding also moots the trustees' appeal on attorney fees because they no longer can be considered as prevailing parties.

DISPOSITION

The judgment is reversed with instructions to the trial court to enter a new declaratory judgment in accordance with the matters discussed in this opinion.

■ In particular, the declaratory judgment should define the term "leased land" as used in the rent adjustment clause (par. 22) of the individual residential ground leases to mean each lessee's interest in his or her individual condominium unit, as particularly described in the "Property Leased" section of the individual ground leases, and his or her undivided fractional interest in the common areas within parcel one or parcel three, depending

upon whether the unit is located in first or second phase of the project. In interpreting the rent adjustment clause (including the terms "rental," "fair market value," "leased land," "highest and best use," and "as improved"), the arbitrators should appraise and value the leasehold interests in accordance with the lessees' described leasehold interests under the respective leases, and should exclude the entirety of the property which is the subject of the common lot lease for parcel two, which lease has been assigned to the HOA.

The trial court is directed to award costs at trial to plaintiffs, and to vacate as moot the postjudgment order regarding the motion by defendants for attorney fees. Costs on appeal are awarded to plaintiffs.

Moore, J., and Aronson, J., concurred.

On November 5, 2010, the opinion was modified to read as printed above.