[No. C066531. Third Dist. Oct. 12, 2012.]

CALIFORNIA DEPARTMENT OF HUMAN RESOURCES et al., Plaintiffs, Cross-defendants and Appellants, v. SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 1000, Defendant, Cross-complainant and Respondent.

**Counsel**

Christopher E. Thomas and Dana Rice Brown for Plaintiffs, Cross-defendants and Appellants.

Brooke Dara Pierman and J. Felix De La Torre for Defendant, Cross-complainant and Respondent.

**Opinion**

**DUARTE, J.**—This appeal arises from the interplay of federal court orders, public employee labor agreements, legislative approval of those agreements, and purportedly binding labor arbitration.

The Department of Personnel Administration (DPA)[1] negotiated with the Service Employees International Union, Local 1000 (Union), representing certain medical employees of California's Department of Corrections and Rehabilitation (CDCR). This produced two similar memoranda of understanding (the MOU's) increasing the salary ranges for some Union employees by certain percentages, effective January 1, 2007. The Legislature and Governor approved these MOU's in September 2006.

---

[1] During the pendency of this appeal, DPA became part of the new California Department of Human Resources.

In October 2006, the federal court ordered an increase in those same salary ranges by a larger amount than the MOU's, effective retroactively to September 1, 2006.[2]

. DPA declined to apply the MOU salary increases on top of the *Plata* increases, generally taking the view that they had been superseded by the larger *Plata* increases. The Union filed a grievance, contending that the MOU increases had to be applied to whatever salary ranges were extant on January 1, 2007, and therefore should be calculated on top of the previously effective *Plata* increases. The dispute was submitted to a labor arbitrator, who sided with the Union, and the trial court confirmed the arbitration award.

DPA and CDCR (collectively, the State) timely filed this appeal. On appeal, the State generally contends the arbitration award violates public policy because its effect is to pay salaries above the levels approved by the Legislature.

Based on two decisions of this court—one decided *after* the judgment—we agree with the State: Even if the arbitrator correctly interpreted the MOU's, salary increases still must be approved by the Legislature to be effective. (See *California Statewide Law Enforcement Assn. v. Department of Personnel Administration* (2011) 192 Cal.App.4th 1 [120 Cal.Rptr.3d 374] (*CSLEA*); *Department of Personnel Administration v. California Correctional Peace Officers Assn.* (2007) 152 Cal.App.4th 1193 [62 Cal.Rptr.3d 110] (*CCPOA*).)

Although the Legislature was aware that the MOU's *might* be construed so that the MOU salary increases would be calculated on top of the *Plata* increases, the expense of such an interpretation was not *explicitly* presented to and approved by the Legislature. Accordingly, we must reverse with directions: To the extent it interpreted an ambiguity in the MOU's, the arbitrator's award must be confirmed; however, "to the extent that the arbitrator's award mandates that the agreement be enforced without unequivocal legislative approval, it violates public policy . . ." (*CSLEA, supra*, 192 Cal.App.4th at p. 16) and must be vacated.

. Further, the portion of the arbitrator's award purporting to retain jurisdiction over this dispute must be vacated. As we shall explain, the Union's

---

[2] The parties refer to the federal case as the *Plata* case, few details of which are relevant to this case. (But see generally *Brown v. Plata* (2011) 563 U.S. ___ [179 L.Ed.2d 969, 131 S.Ct. 1910].)

remedy, if any, is to obtain passage of a bill approving the higher salaries, a remedy squarely in the political realm. Neither the arbitrator nor the judiciary has the power to implement the arbitration award.

## BACKGROUND

*Plata Litigation*

After protracted litigation, the *Plata* court found the State's prison medical care fell below federal constitutional norms. On December 9, 2005, the *Plata* court entered an interim order to increase compensation for some CDCR employees "through recruitment and retention pay differentials, equivalent to a compensation increase of 18 percent."

Effective April 17, 2006, the *Plata* court appointed a receiver to take over "delivery of medical services" to CDCR prisoners, and the receiver was granted power to "renegotiate existing contracts, including contracts with labor unions." The *Plata* court ordered that, if a state law or contract impeded remedial efforts, the receiver "shall request the Court to waive the state or contractual requirement that is causing the impediment. Upon receipt of any such request, the Court shall determine the appropriate procedures for addressing such request on a case-by-case basis."

*The MOU's*

Meanwhile, DPA and the Union had been negotiating new MOU's regarding State Bargaining Unit 20, Medical and Social Services (BU-20), and State Bargaining Unit 17, Registered Nurse (BU-17), and ultimately agreed on MOU's effective July 1, 2005, through June 30, 2008. These MOU's provided for "equity" increases to be "added to the maximum salary rate" of various salary ranges by percentages ranging from 5 to 10 percent, effective January 1, 2007.[3] A separate 3.5 percent "general salary increase" (GSI) was also provided, effective July 1, 2006, for all Union classifications.

Both MOU's reference the *Plata* litigation, albeit in less than crystalline language as follows: "Classifications receiving the [*Plata*] differentials . . .

---

[3] "By long-standing practice, salary levels for state employees have been set as a range, defined by the minimum and maximum for the class, with intermediate steps between the extremes. . . . The DPA rules provide for automatic adjustment of steps, and the salaries of incumbents within the steps, whenever the maximum and minimum salaries of the class are changed." (*Tirapelle v. Davis* (1993) 20 Cal.App.4th 1317, 1342 [26 Cal.Rptr.2d 666], citation omitted (*Tirapelle*).)

shall have their differential adjusted downward by a dollar amount that will result in the incumbents receiving the same gross monthly salary as was received prior to the general salary increase." The BU-20 MOU also states: "It is clearly understood that as the GSI of July 1, 2006 and the above step adjustments are implemented, the [*Plata*] differentials shall be reduced accordingly to achieve parity in base salary, and a [*Plata*] differential of ten percent (10%) above base salary. [¶] Should the Court order any additional adjustments, the parties shall meet and confer over the appropriate adjustments, if necessary, for non-*Plata* classes."

### Costing Summary and Appropriation

On June 26, 2006, DPA gave the Legislature a "costing summary" stating: "As these step increases and the 2006 COLA are implemented, the [*Plata*] differentials will be adjusted so that the base salaries for [*Plata*] classes remain 10% higher than [non-*Plata*] classes. If the Court orders any additional adjustments, the parties shall meet and confer over the appropriate adjustments, if necessary, for non-*Plata* classes." DPA's cost estimates were relied on by the Legislative Analyst's Office (LAO), which itself prepared an analysis for the Legislature, dated July 6, 2006, estimating the fiscal year 2006–2007 cost of the MOU's (and certain other agreements not here relevant) of about $344 million, although the Union did not see DPA's estimates until the arbitration.[4] A Department of Finance (DOF) "enrolled bill report" for the Legislature also describes a $344 million cost for the first fiscal year. The LAO analysis mentioned the possibility of "court orders" in general, and in particular mentioned the *Plata* case in part as follows: "Effective January 1, 2007, registered nurse classifications would have their top salaries increased by 7.5 percent. These and other increases would be administered so that correctional and mental health nurses that received 18 percent pay increases this spring (as a result of court orders in the [*Plata*] case) would have pay levels 10 percent over those of nurses in other departments."

The MOU's were approved by the Legislature and Governor, and became effective on September 6, 2006, in a bill the parties refer to as "AB 1369" (Assembly Bill No. 1369 (Reg. Sess. 2005–2006)) (Assembly Bill 1369).[5] (Stats. 2006, ch. 209, § 6, p. 1994.) Assembly Bill 1369 also appropriated approximately $344 million to pay for the various MOU's.

---

[4] We grant the State's unopposed request for judicial notice of the bill approving the MOU's (Stats. 2006, ch. 209, p. 1992), and related documents, as well as an excerpt of the DPA classification and pay manual. We deny the State's motion for production of new evidence on appeal. We previously granted in part the State's motion to augment the record.

[5] "If agreement is reached between the Governor and the recognized employee organization, they shall jointly prepare a written memorandum of such understanding which shall be presented, when appropriate, to the Legislature for determination." (Gov. Code, § 3517.5.)

*Waiver of State Law*

On September 12, 2006, the week after the MOU's were approved, the receiver moved for an order waiving state law. On October 17, 2006, the *Plata* court granted the receiver's unopposed motion, stating in part:

"[T]he Receiver developed adjusted salary ranges for CDCR clinicians that are more consistent with those paid by the State . . . at hospitals operated by the University of California health care system. [Citation.] The Receiver and his staff then spent several weeks discussing this matter with Defendants and the relevant state agencies. Defendants did not dispute either the reasonableness of the recommended salary ranges or the necessity of implementing them promptly. They declined, however, to unilaterally implement them because of questions regarding constraints imposed upon them by state law. . . .

"Although Defendants . . . could not implement the recommended salary adjustments promptly on their own, they invited the Receiver to request a waiver of those state laws that posed obstacles to making the recommended salary adjustments in a timely fashion, and offered to assist the Receiver in their implementation."

The *Plata* order lists specific laws to be waived "to permit the Receiver to 'direct the implementation, adjustment and administration of the proposed salaries and structural changes to the pay system' attached to his motion as Exhibit 6" and states the State reaffirmed "support for the proposed salary adjustments and the need for a waiver given the requirements of California law." The order states the *Plata* court could not "permit the State to attempt to address the issue of inadequate salaries through normal collective bargaining channels" because "it has already had this opportunity and failed." The order also provides:

"The following state law requirements shall be waived *for the sole and limited purpose* of enabling the Receiver to direct the implementation, adjustment, and administration of the proposed salaries and structural changes to the pay system set forth in Exhibit 6 to the Receiver's Motion for Waiver.

"California Government Code Sections 19816, 19826, 19829, 19832, 19836, 3516.5, 3517.

"California Code of Regulations Title 2, section 599.681.

"In granting this limited waiver, the Court clarifies that such waiver is not intended to relieve Defendants or the State of any of their duties and responsibilities under California law, including the obligation to collectively bargain regarding salaries."

The statutes waived include those prescribing DPA's duty to set salary ranges (Gov. Code, § 19826) and the State's duty to bargain in good faith with unions. The *Plata* order implements an 18 percent increase in salary ranges, retroactive to September 1, 2006, and these raises took effect without legislative approval.[6]

### Arbitration

DPA later asserted that the *Plata* raises, which exceeded those provided by the MOU's, in effect superseded the MOU's. The Union took the position that the MOU raises had to be calculated *on top of* the *Plata* raises.

The parties submitted the interpretive dispute to "binding" arbitration, pursuant to MOU grievance procedures. On July 2, 2008, the arbitrator entered an award agreeing with the Union and ordering the following remedy: "The Employees at issue shall be made whole for all lost income and benefits. [¶] The Arbitrator retains jurisdiction over any dispute that may arise out [of] the implementation of the remedy."

### Trial Court Proceedings

On July 16, 2008, the State petitioned to vacate the award, contending the arbitrator exceeded his jurisdiction by changing the salary structure approved by the Legislature, and that the award "interferes with" the *Plata* order. The Union sought confirmation of the arbitrator's award.

---

[6] The State acknowledges that the *Plata* order did not need legislative approval due to "federal supremacy principles." The *Plata* waiver allowed bypassing the Ralph C. Dills Act (Dills Act), formerly the State Employer-Employee Relations Act, which otherwise governs collective bargaining with public employee unions. (Gov. Code, § 3512 et seq.; see *Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 175–179 [172 Cal.Rptr. 487, 624 P.2d 1215] (*Pacific Legal Foundation*).) The duty of the State to "meet and confer" with public employee unions began with an executive order by Governor Ronald Reagan (*Pacific Legal Foundation, supra,* 29 Cal.3d at pp. 176–177), and is now codified in Government Code section 3517, one of the statutes waived by the *Plata* order.

The trial court confirmed the arbitration award, and the State timely filed this appeal. The appeal lies. (Code Civ. Proc., § 1294, subd. (d).)

*Subsequent Federal Court Proceedings*

After the notice of appeal was filed, the State moved in federal court to clarify the *Plata* order, "to specify that the [employees] who received [*Plata*] pay increases in October 2006 should continue to receive those pay increases, but not the labor market adjustments bargained [in the MOU's] prior to" the *Plata* order. The Union opposed this motion, partly calling it "a thinly veiled attempt to get another bite at the apple."[7]

On August 25, 2011, the *Plata* court partly granted the State's motion to clarify, but not in a way that helped the State. The *Plata* court acknowledged that the MOU's became effective on September 6, 2006, and provided for salary increases effective January 1, 2007, but stated in part:

"Although the agreements became effective prior to the briefing on the Receiver's motion for waiver of state law, neither the Receiver's nor Defendants' briefing mentioned the future increases contained in these MOUs.

"To date, DPA has not authorized payment of [the MOU increases] because it has taken the position that the salary ranges in the Court's October 17, 2006 order superseded all previously negotiated salaries. . . . The case is currently pending on appeal before the California Third District Court of Appeal. [¶] . . . [¶]

"The intent of the Court's order was to replace all then-existing salary ranges with the new ranges proposed by the Receiver[.] The Court was unaware at the time that any clinical salaries were due to be increased under collective bargaining agreements in January 2007—less than three months later—and may well have denied those increases after such a short time had they been timely presented to the Court. . . . However, no evidence of any such increases was presented to the Court, and the Court cannot now say that it intended to waive something of which it was unaware.

". . . The Court did not and does not now approve any salary increases beyond those contained in Exhibit 6 to the Receiver's September 12, 2006 motion for waiver of state law, and no party has requested such an order, let alone made the required showing that such increases are required to remedy

---

[7] We grant the Union's unopposed request for judicial notice of postjudgment documents in the *Plata* case, and of DOF documents describing the budget process.

the constitutional issues in this case. However, the Court did not and does not now prohibit any salary increases that are implemented consistent with state law."

On appeal, the Union incorrectly asserts the *Plata* court "struck down" the State's argument. Instead, as indicated in the above quotation, the *Plata* court merely declined to resolve the issue presented by this appeal, because it was not timely presented to the *Plata* court.[8]

## DISCUSSION

We agree with the Union that the arbitrator's interpretation of the MOU's vis-à-vis the *Plata* order must be sustained, because it was not arbitrary. (See pt. I, *post*.) But, contrary to the Union's view, because the Legislature did not approve the resulting higher salaries, the MOU's as construed by the arbitrator cannot bind the Legislature. Therefore the arbitrator lacked authority to award relief, and perforce lacked authority to retain jurisdiction over the dispute. (See pt. II, *post*.) Finally, as we shall explain, the trial court's finding that the State had not shown funds were not available to pay the higher salaries does not support confirming the arbitration award. (See pt. III, *post*.)

I

*The Arbitral Interpretation of the MOU's*

The parties stipulated that the correct interpretation of the MOU's was an issue properly before the arbitrator. However, the MOU grievance procedures provided: "The arbitrator shall have no authority to add to, delete, or alter any provisions of this Contract, or any agreements supplementary thereto, but shall limit the decision to the application of the Contract to the facts and circumstances at hand." The trial court found that even if the arbitrator *misinterpreted* the MOU's, that would not provide grounds to set aside the award. We agree. Because the MOU's did not unambiguously explain how a subsequent order in the *Plata* case would be coordinated with the MOU salary range increases, we cannot say the arbitrator's award was irrational or that it arbitrarily remade the contract.

■ A trial court "shall vacate" an arbitration award if the arbitration panel exceeds its powers *and* "the award cannot be corrected without

---

[8] Why the issue was not timely presented to the *Plata* court is a question not answered by the record. But the issue was made known to the federal receiver by the State. In any event, the *Plata* court clarification undermines the Union's view that the *Plata* court order itself supports the arbitrator's remedy.

affecting the merits of the decision . . . ." (Code Civ. Proc., § 1286.2, subd. (a)(4).) This can occur if the award "violates a well-defined public policy." (*CCPOA, supra*, 152 Cal.App.4th at p. 1195; see *Jordan v. Department of Motor Vehicles* (2002) 100 Cal.App.4th 431, 443 [123 Cal.Rptr.2d 122].) But, "with limited exceptions, 'an arbitrator's decision is not generally reviewable for errors of fact or law, whether or not such error appears on the face of the award and causes substantial injustice to the parties.' " (*CCPOA, supra*, 152 Cal.App.4th at p. 1200.) A trial court may vacate an award interpreting a contract if and only if it "rests on a 'completely irrational' construction of the contract [citations] or . . . amounts to an 'arbitrary remaking' of the contract." (*Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 376–377 [36 Cal.Rptr.2d 581, 885 P.2d 994].)

An ambiguity exists when language as applied to a concrete dispute is reasonably susceptible of different, plausible, meanings. (*Abers v. Rounsavell* (2010) 189 Cal.App.4th 348, 356–357 [116 Cal.Rptr.3d 860]; *California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1986) 177 Cal.App.3d 855, 859, fn. 1 [223 Cal.Rptr. 246].)

The MOU's are ambiguous as to their relationship to the *Plata* increases. They provided for specific increases to the "maximum" salary ranges for specific employees, effective January 1, 2007. They became effective on September 6, 2006, with a GSI effective retroactively to July 1, 2006. However, as we described *ante*, the *Plata*-increased ranges also took effect before January 1, 2007. The State plausibly posits that the MOU increases effectively became moot, because of the earlier and higher *Plata* increases. The Union plausibly posits that the MOU increases were intended to increase whatever the "maximum" salary ranges were extant on January 1, 2007.

■ Both candidates of meaning tendered by the parties are plausible, because although the MOU's *mentioned* the *Plata* litigation, they did not clearly explain whether a *Plata* court order raising salary ranges would add to the MOU raises, or supersede them. Therefore, the arbitrator's interpretation, choosing between two plausible constructions, was not irrational.

Accordingly, to the extent the judgment confirms the arbitrator's interpretation of the MOU's, it must be affirmed.

II

*Arbitral Power Regarding State Employee Compensation*

The Union contends our prior decisions limiting the scope of arbitral power regarding state employee compensation are distinguishable and do not

bar the arbitral relief granted in this case. Although the facts of our prior decisions differ from this case, the principle we announced is fully applicable, and compels a partial reversal.

In *CCPOA, supra,* 152 Cal.App.4th 1193, an MOU contained a scrivener's error, and an arbitrator reformed the MOU to correct the error. (*CCPOA, supra,* at pp. 1196–1199.) The trial court vacated the award on the ground that the arbitrator had exceeded her powers, because the drafting error was unknown to the Legislature and Governor when they approved the MOU. (*Id.* at pp. 1199–1200.)

We affirmed because, "In changing the terms of the MOU after it was approved by the Legislature, the arbitrator exceeded her powers by violating the Dills Act and the important public policy of legislative oversight of state employee contracts." (*CCPOA, supra,* 152 Cal.App.4th at p. 1195.) We explained that reformation due to mutual mistake is *not* a proper remedy if it prejudices the rights of a third party. (*CCPOA, supra,* at p. 1200, citing *Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 524 [117 Cal.Rptr.2d 220, 41 P.3d 46]; see Civ. Code, § 3399.) The MOU grievance procedures in *CCPOA* precluded the arbitrator from altering the agreement, to assure "the Legislature that the MOU it approves is the parties' actual contract, that there are no off-the-record agreements to which it is not privy, and that the MOU will not be altered subsequently." (*CCPOA, supra,* 152 Cal.App.4th at p. 1202.)[9]

The trial court herein distinguished *CCPOA* as follows: "The fact that the Legislature approved the MOUs distinguishes this case from [*CCPOA, supra,*] 152 Cal.App.4th 1193, in which the court held the arbitrator exceeded his authority by *reforming* an MOU and enforcing terms that were never submitted to the Legislature. Here, it is undisputed that the terms of the MOUs *were* submitted to and approved by the Legislature. Thus, to some extent Petitioners' argument reduces to the proposition that an arbitrator's interpretation of language in a contract approved by the Legislature is equivalent to an arbitrator's action reforming a contract to contain terms *never* approved by the Legislature. Were that the law, the rules pertaining to arbitral finality would be seriously compromised in every case involving the interpretation of language contained in a contract to which the State is a party."

However, this narrow construction of *CCPOA* proves untenable in light of a subsequent decision of this court.

In *CSLEA, supra,* 192 Cal.App.4th 1, an MOU reclassified certain union members from "miscellaneous" to "safety" status—a status conferring enhanced retirement benefits—and that MOU was approved by the Legislature.

---

[9] As noted *ante,* a similar provision was contained in the MOU's at issue in this case.

(*CSLEA, supra*, at pp. 4–5.) However, that MOU did not state whether or not the reclassification would apply to prior service. An arbitrator concluded the reclassification applied retroactively, and the arbitral award was confirmed by the trial court. (*Id.* at pp. 6–12.)

We reversed in part, summarizing our holding as follows: "[W]e defer to the arbitrator's decision, based on extrinsic evidence, that the agreement between DPA and CSLEA to move employees of Unit 7 into safety member retirement status included an agreement to apply the new status retroactively to encompass all prior service credit by members employed as of July 1, 2004. However, the MOU presented to the Legislature did not contain language that the change to safety member status would apply retroactively to convert prior miscellaneous member status to safety member status; Senate Bill 183 was 'silent' as to whether the benefit would apply retroactively to prior service; and the Legislature was not provided with a fiscal analysis of retroactive application of the agreement. Because the part of the agreement giving Unit 7 employees retroactive safety service credit was never explicitly presented to the Legislature for approval, as required by . . . the Dills Act, the arbitrator erred in concluding that Senate Bill 183 mandates retroactive safety member retirement benefits. Accordingly, we will reverse the judgment to that extent. The retroactive part of the agreement may be enforced only if it and its fiscal consequences are explicitly submitted to, and approved by vote of, the Legislature." (*CSLEA, supra*, 192 Cal.App.4th at pp. 5–6.)

The arbitrator in *CSLEA* had found a fiscal analysis presented to the Legislature " 'expressly noted the possibility' " of retroactivity. (*CSLEA, supra*, 192 Cal.App.4th at p. 11.) The trial court had upheld the award, because the arbitrator "did not reform the parties' agreement in a manner that changed the provisions approved by the Legislature." (*CSLEA, supra*, at p. 12.) Applying a deferential review, we accepted the arbitrator's conclusion "that both DPA and CSLEA intended the agreement to apply retroactively to prior service credit at the time the agreement was negotiated." (*Id.* at pp. 15–16.) Nonetheless, we rejected the view that by filling in the silence of the MOU in *CSLEA*, the arbitrator was merely *interpreting* that MOU:

"[N]othing in Senate Bill 183 or section 19816.21 [defining certain employees as safety members, effective July 1, 2004], indicates the Legislature approved conferring the safety member retirement status retroactively to cover prior miscellaneous member retirement service credit. Such approval is necessary under the Dills Act. [Citations.] Consequently, to the extent that the arbitrator's award mandates that the agreement be enforced without unequivocal legislative approval, it violates public policy for the same reasons as in [*CCPOA*,] *supra*, 152 Cal.App.4th 1193.

"CSLEA believes that this is 'a flawed and over-expansive interpretation' of [*CCPOA*] because the parties in that case neglected to eliminate a contract provision due to a scrivener's error and, thus, the Legislature approved a contract that included a provision the arbitrator later deleted to conform to the intent of the contracting parties. Here, in contrast, the agreement 'is silent on the point' whether the safety member retirement benefit will be retroactive. *But that is the point.*

"The Legislature enacted Senate Bill 183 to effectuate an MOU that did not contain the parties' entire agreement. The arbitrator rectified this after the fact by construing the MOU as bestowing retroactive safety member retirement service credit for prior miscellaneous member service credit. That [*CCPOA*] involved a deletion from the express written terms of the MOU, whereas this case involves an addition to the express written terms of the MOU, is a distinction without a difference.

"Section 19816.21 was enacted to enable Unit 7 to qualify for safety member retirement benefits in accordance with the parties' MOU. Absent language in the written MOU stating the benefit would be retroactive, we cannot say that section 19816.21 was intended to do anything more than give Unit 7 members safety retirement benefits effective July 1, 2004. Stated another way, we cannot say that the Legislature approved the unwritten agreement to bestow the safety member benefits retroactively. Indeed, the arbitrator found 'the enabling bill, which echoed the March 11 Agreement, was . . . silent on whether the benefit was intended to apply "retroactively" to cover an employee's previous service in a classification that was being reclassified from Miscellaneous to State Safety.'

"CSLEA and the superior court appear to believe that it is sufficient the Legislature was aware the benefit *could be* conferred retroactively in light of certain statutes and enrolled bill reports. . . .

"However, the mere fact the Legislature was aware that DPA might determine to credit the miscellaneous service as safety service does not mean that the Legislature was aware the parties' negotiated MOU actually included an unwritten agreement for retroactivity." (*CSLEA, supra*, 192 Cal.App.4th at pp. 16–17, fn. omitted.)

We then summarized the applicable rule as follows:

"Simply stated, it is not sufficient that the Legislature was aware DPA could agree with CSLEA to make the safety member retirement credit retroactive. The Legislature had to (1) be informed explicitly that DPA and CSLEA did enter into such an agreement, (2) be provided with a fiscal analysis of the cost

of retroactive application of the agreement, and (3) with said knowledge, vote to approve or disapprove the agreement and expenditure.

"Because Senate Bill 183 and the materials provided to the Legislature regarding the bill did not state that the reclassification would be applied retroactively and did not contain a fiscal analysis of the cost of the retroactive application of safety member status for all employees in Unit 7, we must vacate that portion of the arbitration award as violating the public policy embodied in the Dills Act." (*CSLEA, supra,* 192 Cal.App.4th at p. 19, fn. omitted.)

Here, in the instant case, the Union correctly states that the Legislature was advised the *Plata* order "could potentially impact" the cost summaries it relied on in approving the MOU's. The Union contends that, "Because the equity adjustment language, including a projected costing analysis that cautioned the Legislature about unknown fiscal variables, was explicitly presented to the Legislature for approval, the arbitration award did not violate public policy."

■ We disagree for the same reason stated in *CSLEA*: Legislative awareness of an ambiguity does not equate to approval of benefits (in *CSLEA*, enhanced pensions; here, increased salaries) in excess of those *explicitly presented to and approved by the Legislature.* The MOU's did not unambiguously describe how the *Plata* order was to mesh with the MOU salary ranges, and the Legislature did not explicitly approve "maximum" salary ranges above the amounts stated in the MOU's. In effect, contrary to the Union's view, the MOU's *were* "silent" on this point, as in *CSLEA*. To paraphrase the critical holding in CSLEA:

"Simply stated, it is not sufficient that the Legislature was aware DPA could agree with [the Union to calculate the *Plata* increase on top of the MOU increase]. The Legislature had to (1) be informed explicitly that DPA and [the Union] did enter into such an agreement, (2) be provided with a fiscal analysis of the cost [of applying the *Plata* increase on top of the MOU increase], and (3) with said knowledge, vote to approve or disapprove the agreement and expenditure." (*CSLEA, supra,* 192 Cal.App.4th at p. 19.)

(4) Accordingly, to the extent the arbitrator ordered the State to implement the *Plata* increases on top of the MOU increases, the award violates public policy because it mandates a fiscal result that was not explicitly approved by the Legislature.

In what the State characterizes as a "blank check theory," the Union argues that because the MOU grievance provisions were approved by the Legislature, the ". . . Legislature therefore explicitly approved the use of an arbitrator to resolve any disputes involving the interpretation, application, or enforcement of the equity adjustment language." As stated earlier (pt. I, *ante*) we accept the arbitrator's interpretation of the MOU's as a *linguistic* matter. But the Legislature never approved paying the higher salaries called for by the remedy fashioned by the arbitrator. The delegation of authority to interpret the MOU's could not vest the arbitrator with the power to authorize expenditures above those authorized by the Legislature. (See *CSLEA, supra*, 192 Cal.App.4th at p. 18 [fact that DPA had the delegated authority to negotiate an agreement did not negate requirement of legislative approval].)

Further, the Union provides no explicit defense of the portion of the arbitrator's award purporting to retain jurisdiction over the dispute. The remaining dispute lies outside the realm of arbitration or adjudication. The Union's remedy, if any, is to obtain passage of a bill approving those higher salaries, a political, not legal, remedy. (See *CSLEA, supra*, 192 Cal.App.4th at pp. 5–6, 19; *CCPOA, supra*, 152 Cal.App.4th at pp. 1202–1203.)

Accordingly, the judgment confirming the arbitration award must be reversed to the extent it orders relief and to the extent it purports to retain jurisdiction over this dispute.

### III

### *Appropriations Claim*

The trial court placed the burden on the State to show that appropriated funds *were not available* to pay for the arbitral remedy, and found the State's showing wanting. The trial court cited *County of San Diego v. State of California* (2008) 164 Cal.App.4th 580 [79 Cal.Rptr.3d 489] (*County of San Diego*), involving a court order compelling an appropriation of funds. (*County of San Diego, supra*, 164 Cal.App.4th at pp. 598–599.) Such orders may trench on the state constitutional limitation that "Money may be drawn from the Treasury only through an appropriation made by law and upon a Controller's duly drawn warrant." (Cal. Const., art. XVI, § 7; see *California State Employees' Assn. v State of California* (1973) 32 Cal.App.3d 103, 107–108 [108 Cal.Rptr. 60]; *Tirapelle, supra*, 20 Cal.App.4th at p. 1321 & fn. 5.) In such cases the question is whether legislatively appropriated funds may be used to satisfy a court-ordered remedy. (See *Butt v. State of California*

(1992) 4 Cal.4th 668, 697–703 [15 Cal.Rptr.2d 480, 842 P.2d 1240] ["narrow circumstances" where "judicial orders for the disbursement of appropriated funds do not invade valid legislative functions"]; *Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1162–1163 [61 Cal.Rptr.2d 207]; see also *Grossmont Union High School Dist. v. State Dept. of Education* (2008) 169 Cal.App.4th 869, 888–889 [86 Cal.Rptr.3d 890] ["the judiciary has no general authority to compel appropriations or second-guess legislative spending decisions"].)

But as we have already explained (pt. II, *ante*), an arbitrator cannot order a remedy in a public employee contract dispute if it compels payment of funds not explicitly approved by the Legislature. (See *CSLEA, supra*, 192 Cal.App.4th at pp. 5–6, 19; *CCPOA, supra*, 152 Cal.App.4th at pp. 1202–1203.) Thus, although the trial court found the State did not prove a lack of available funds to pay the remedy ordered by the arbitrator, that was not a relevant finding.[10]

The fact that DOF represented to the *Plata* receiver that funds could be found to pay the *Plata* increases is of no moment. As we have noted, the *Plata* increases took effect without legislative action due to federal supremacy principles. (See fn. 6, *ante*.) Nothing in the DOF's representation to the receiver suggested there were funds available to pay anything *more* than the *Plata* increases. The document cited by the Union on this point is a letter dated August 25, 2006, in which the DOF chief counsel explained that the DOF director "will authorize" a transfer of appropriated funds to pay for the *Plata* increases "once those salaries are approved by [DPA] or the DPA approval process is superseded by court order." This letter explains that such a transfer by the DOF director was explicitly permitted by the relevant budget act. This letter confirms that, absent a superseding federal court order, funds must be spent as designated by the Legislature, but acknowledges that some appropriations are broadly worded to allow funds to be shifted from one budgetary line item to another. This letter does not show that DOF—or any other entity but the Legislature—has the general authority to appropriate State money.[11]

---

[10] At oral argument, the Union pointed to portions of the LAO report to show that the $344 million appropriation provided by Assembly Bill 1369 was based on incorrect assumptions about staffing vacancy rates and about the levels of pay of staffed positions; therefore, in effect, there was "room" within that appropriation to pay for the *Plata* increases on top of the MOU increases. But even if we agreed with the Union on this point, that does not change the fact that the Legislature did not direct that any surplus money found within the Assembly Bill 1369 appropriation should be used to pay for *Plata* increases on top of MOU increases.

[11] This letter—to the federal *receiver*—also argues that, given the MOU increases, court-ordered increases may not be necessary. However, as we have noted *ante*, the MOU increases were not timely brought to the federal *court's* attention.

■ We agree with the Union that not all cost estimates submitted to the Legislature prove accurate, and the fact an estimate proves too low does not of itself indicate that an expenditure is invalid. But, as stated in budgeteering documents tendered by the Union, this is either because of a "trailer" or supplemental appropriations bill, or a General Fund appropriation providing for deficiency funding. Neither the arbitrator nor DPA and CDCR can arrogate the authority to spend unappropriated funds, or divert appropriated funds to an undesignated purpose.

At various points in its briefing, the Union suggests DPA and CDCR could comply with the arbitrator's award by *asking* the Legislature to implement the award. The Union asserts "The arbitration award does not order the Legislature to appropriate funds" but is merely "an order to DPA and CDCR to comply with the parties' MOU. It was DPA and CDCR that agreed to pay the equity adjustments, which carried with it the obligation to seek Legislative approval for the funds necessary to uphold their end of the bargain. [Citations.] The arbitration award merely enforces the bargain." But the Union also states DPA and CDCR have a duty "to determine if sufficient funds are available, or to seek Legislative approval to fund any deficiency." Thus, under the Union's view, DPA and CDCR must scour their budget appropriations to see if they have extra money to pay for the increased salaries, and *then* "seek" legislative approval to cover any shortfall.

But neither DPA and CDCR, nor both acting jointly, can force the Legislature to do anything. As explained above, the Union's sole remedy lies in the political realm, not with the arbitrator or the judiciary.[12] (See *CSLEA, supra*, 192 Cal.App.4th at pp. 5–6, 19; *CCPOA, supra*, 152 Cal.App.4th at pp. 1202–1203.)

### DISPOSITION

The judgment confirming the arbitration award is reversed with directions to vacate the award to the extent it mandates applying the *Plata* increase on top of the MOU salary ranges, "without first obtaining Legislative approval of this portion of the parties' agreement" (*CSLEA, supra*, 192 Cal.App.4th at p. 20) and to the extent it purports to retain arbitral jurisdiction over this

---

[12] The Union asserts the arbitral award "should be treated no differently than any other monetary judgment against the State." If the award is to be treated as a money judgment, it must be treated as a *void* money judgment, for the reasons stated in part II, *ante*.

dispute. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5); see *CSLEA, supra*, 192 Cal.App.4th at p. 20.)

Raye, P. J., and Butz, J., concurred.

Respondent's petition for review by the Supreme Court was denied January 3, 2013, S206755.