Filed 11/28/22  Marriage of Herbers and Ferrari CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re Marriage of HOLLY HERBERS and TODD ERIK FERRARI. | |
| HOLLY HERBERS FERRARI, Appellant, v. TODD ERIK FERRARI, Respondent. | D079258 <br><br> (Super. Ct. No. D561571) |

APPEAL from an order of the Superior Court of San Diego County, Victor N. Pippins, Judge.  Affirmed.

Dennis Temko for Appellant.

Patrick L. McCrary for Respondent.

This family law appeal presents a question of contract interpretation. Ending their twenty year marriage, Holly and Todd Ferrari stipulated how to divide their community assets in a Marital Settlement Agreement (MSA).[1] Among those assets were military retirement benefits accrued during Todd's many years of military service. With Todd expecting to retire from the U.S. Navy in two years, the MSA referenced some relevant statutory criteria, expressed an intention to divide the pension "equitably," and fixed a dollar amount of $2,551 that Holly would receive each month. Later claiming the inputs used to derive that number were off, Todd successfully moved to reduce Holly's share. Reasoning that the parties sought an equitable division of the military pension pursuant to a statutory formula that factored in a servicemember's retired base pay and years of service, the family court determined it would be inequitable not to reduce Holly's interest to accurately reflect Todd's retired base pay.

Holly appeals, arguing the court misconstrued the plain language of the MSA and rewrote an agreement that entitles her to a fixed dollar amount. Finding the MSA ambiguous, we consider the undisputed admissible extrinsic evidence to reject her claim and affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

Todd and Holly married in 1995 and separated in 2016 after 20 years and eight months of marriage. The court entered a stipulated judgment of dissolution in July 2019, incorporating an attached MSA that gave Holly $616 in monthly spousal support until Todd's anticipated retirement from the U.S. Navy in March 2021 and specified a division of community assets,

---

[1] We refer to the parties by their first names for clarity and intend no disrespect.

including the family home, personal property, vehicles, bank accounts, business interests, and retirement benefits.

Holly's pension plan from Pfizer was to be divided by way of a Qualified Domestic Relations Order (QDRO), with each party receiving a community interest pursuant to the " '[t]ime rule.' " Todd's "Naval Military Service Retirement Plan" was also addressed:

> "The community interest shall be equitably divided pursuant to National Defense Authorization Act (NDAA) of 2017, § 641, and revised § 624, of the NDAA of 2018: The amount of retired pay to which Husband (service member) would have been entitled using the member's retired pay base and the number of years of service on the date of the decree of divorce, dissolution, annulment, or legal separation, increased by the cost-of-living amounts granted to military retirees from date of the (divorce) to the date the member retires. [¶] . . . [¶]

> "The Parties married on October 27, 1995. Their marital status was terminated with entry of Stipulated Dissolution Judgment herein entered in San Diego County, State of California.

> "The parties were married for a period of ten (10) or more years during which time the Respondent/Husband performed at least ten (10) years of service creditable for retirement eligibility purposes.

> "Respondent/Husband is an active duty military member at the time of this order . . . . [¶] . . . [¶]

> "Petitioner/Wife is entitled to a portion of Respondent/Husband's United States Military retired pay as set forth herein.

> "Based on foregoing data, Petitioner/Wife as former spouse is hereby awarded $2,551[ ] monthly of Respondent member's disposable military retirement pay."

In the next subheading, the MSA outlined Holly's right to participate in a Survivor Benefit Plan (10 U.S.C. § 1447 et seq.) so that she could continue

3

receiving a portion of Todd's retirement pay if he died before her. Upon Todd's retirement, Holly could elect to participate in the plan and pay the monthly premiums. This section of the MSA also states:

> "The parties intend that the division of military benefits shall be consistent with [the] Uniformed Services Former Spouses' Protection Act [(USFPA)] in effect as of the date of Judgment, and the Court shall reserve jurisdiction to make any orders necessary to effectuate the division of military retirement benefits consistent with the USFPA.
>
> "On the date of Stipulated Marital Dissolution Judgment entry, the Respondent service member's military retired pay base (high-3) was $7,038, and the member had 25 years 11 months of creditable military service.[2]
>
> "On the date of the decree of Marital Dissolution, Respondent service member's military retired pay base (high-3) was $6,821[,] and the member had zero (-0-) Reserve retirement points."

Elsewhere in the MSA, Todd and Holly each stipulated to certain waivers of discovery, investigation, and asset valuation. Both agreed that they "accepted the statements of each other" or relied on their own knowledge to negotiate the MSA's terms and provisions at arm's length. To minimize legal expenses, each party limited their attorney's investigation and discovery and agreed to "settle the case as set forth in this [MSA] without a full and complete assessment of the value of the community estate." Each further acknowledged "that this [MSA] may or may not result in an equal division of the community property." The parties agreed to reserve jurisdiction in San Diego Superior Court to "[s]upervise the division of assets as agreed in this Agreement."

---

2 The "high-3" (also called "high-36") retired pay base reflects a servicemember's highest average monthly basic pay earned during any three years or 36 months of service. (10 U.S.C. § 1407(c)(1).)

In February 2021, Todd filed an application for ex parte relief, stating that the MSA contained input errors affecting the division of his military pension. Concurrently, he filed a "Request for Order to Determine [and] Correct Judgment Calculation [and/or] Appoint Elisor[,] Execute Errata [and] [Constructive] Trust" (RFO).

Todd's attorney William Trausch submitted a declaration stating he had drafted the portions of the MSA dealing with Todd's military pension based on data his client had given him. After serving a copy of the stipulated judgment on the Defense Finance and Accounting Service (DFAS), Trausch apparently received an error notice in November 2019.[3] He reached out to Holly's former counsel and they jointly retained Kristine Colburn, the attorney who had prepared QDROs for other community assets, to analyze the underlying data and draft a proposed corrective order. Based on Colburn's calculations, Holly was entitled to receive $1,415 per month in net military pension benefits (after accounting for survivor benefit plan premiums). Todd sought ex parte relief after Holly refused to sign the proposed stipulation.

Todd also submitted a declaration in support of his RFO. He explained that there was an input error in the MSA because he had relied on data provided by the Naval pay specialist, which confused his active duty pay with

[3]    DFAS directed Trausch to verify Todd's social security number and obtain a court order including "all the necessary elements required to calculate the division of the military retirement" pursuant to the Uniformed Services Former Spouses Protection Act (USFSPA) (10 U.S.C. § 1408). Specifically, DFAS wanted an order specifying, "1. A fixed amount, a percentage, a formula, or a hypothetical that the former spouse is awarded; 2. The member's high-3 amount at the time of divorce (the actual dollar figure); [and] 3. The member's years of creditable service at the time of divorce."

his anticipated retirement base pay to arrive at a $2,551 community share. After further inquiry, it turned out that his actual retirement base pay was only $4,278 per month, making Holly entitled to $1,415 per month after deducting her survivor benefit premium.

Finally, Todd filed a notice of lodgment that included various letters between Trausch, Holly's former counsel Edward Satuloff, and Colburn. In June 2020, Trausch wrote to Colburn, copying Satuloff, indicating that after DFAS had sent its error notice, Todd obtained a Navy paymaster recalculation of his retired benefits. Colburn replied in August that Holly was entitled to only $1,415 per month of military pension benefits based on her calculations.[4] Trausch sent Satuloff a stipulation executed by Todd in September to correct the division of his military pension. A month later, Holly became self-represented. Trausch wrote to her in December explaining that there were errors in Todd's high-3 base pay and hypothetical retired base pay necessitating recalculation of her spousal interest, and asking her to sign the stipulation.

Opposing Todd's ex parte request, Holly filed a responsive declaration. She explained that DFAS sent an error notice in November 2019 due to a typographical error with Todd's social security number. When she resubmitted the judgment to DFAS with the form properly filled out, she received no rejection in response. Holly averred that the MSA was negotiated as a global settlement, with the fixed dollar amount of $2,551 reflecting what she agreed to accept in exchange for a reduction of spousal support. She maintained that any error was purely on Todd's end, and that she was entitled to the amount in the MSA that DFAS had since accepted.

---

[4] To avoid repetition, Colburn's methodology is described in the discussion.

Holly lodged e-mails between Trausch and her new counsel, Rebecca Ritchey. In December 2020, Ritchey told Trausch that if Todd intended to "renegotiate the amount of monthly pension that [Holly] receives, then we are going to have to set aside the entire Judgment, as her consent to the remainder of the agreement is reflexive [*sic*] of the amount she was receiving of his pension."

Finding no emergency, the family court denied Todd's ex parte request and set an RFO hearing on April 7, 2021. Holly filed another responsive declaration again stating there was no error on DFAS's end once the social security issue had been corrected. Although Todd felt the MSA misstated Holly's share of his military pension, DFAS had accepted the paperwork and judgment, and there was no indication the amount needed recalculation.[5] Holly reiterated that she had accepted the fixed dollar amount in exchange for a reduction in spousal support. While the parties could have relied on percentages, it was Todd who thought it best to set a fixed dollar amount in the stipulated judgment rather than spend money later to have the order correctly prepared. When the MSA was being negotiated, Todd's attorney apparently e-mailed Holly's counsel suggesting the $2,551 figure would avoid the need for a separate court order dividing military retirement, saving fees and costs.

Todd filed a reply declaration disagreeing that the $2,551 amount was negotiated as part of a global settlement. He noted that nearly all other

---

[5] Holly filed a supplemental declaration on April 1 reporting the contents of her conversation with a DFAS agent, who purportedly confirmed that she was set to receive $2,551 per month as provided in the MSA. Todd objected to this declaration on hearsay grounds. There is no indication in our record that the family court ruled on Todd's objection, and neither party relies on this evidence on appeal.

community assets were equally divided, including the family home and Holly's Pfizer pension. Likewise, the MSA indicated that the community interest in his Naval Military Service Retirement Plan was to be "equitably divided" based on inputs such as Todd's retired base pay, years of service during the marriage, and cost of living adjustments. Correcting the erroneous inputs resulted in a reduced pension award to both of them, with Todd set to receive only $2,584 and Holly to receive $1,693 per month. After he filed his RFO, DFAS had determined that Todd was entitled to only $4,817 per month in gross monthly retired pay, a figure that corresponded with Colburn's estimates.[6] Accordingly, Todd asked the court to find an error in the stipulated judgment's division of his military pension and either correct the error or appoint an elisor to execute the proposed stipulation for Holly. Todd further requested that the court place a constructive trust over any excess retirement amounts Holly had already received.

In conjunction with his reply, Todd lodged four additional exhibits. Particularly relevant to this appeal, Todd presented e-mails between Trausch and Holly's former counsel (Satuloff) before the MSA was signed discussing the proposed language to divide Todd's military retirement benefits. He also submitted DFAS communications from March 2021 reflecting Todd's actual monthly retired pay and monthly survivor benefit premiums. With a supplemental reply declaration, Todd lodged a DFAS letter dated April 1, 2021, finding a high-3 error in the MSA and requesting a clarifying court order. A separate DFAS letter identified another error in the MSA as to

---

6    Colburn estimated his retirement base pay as being $4,278, whereas DFAS calculated it to be $4,817. The disparity in these numbers is attributable to the statutory "frozen benefit rule," discussed later.

survivor benefits, the premiums for which had to be deducted directly from Todd's military retirement pay and not from Holly's share in the pension.

The parties appeared before Judge Victor Pippins on April 7, 2021. At the hearing Todd explained that he was not asking for a set aside (Code Civ. Proc., § 473; Fam. Code, § 2122, subd. (e)), but rather to correct the judgment to reflect the parties' agreement. Holly disagreed, claiming the parties had agreed to a fixed dollar amount. Todd replied that e-mails between the parties before the MSA's execution made clear that they sought to apply the standard formula to divide his military benefits but used the wrong inputs. To this, Holly suggested that if the court were to correct that one term, it would rewrite the entire MSA because she "certainly is not getting the benefit of the bargain."

The court asked Holly's counsel what to make of language in the MSA that the $2,551 figure was "based on the foregoing data." She responded that no "data" preceded that phrase. Todd's counsel urged the court to read the two separate sections in the MSA dealing with military benefits together. In Todd's view, the latter section listed incorrect inputs that informed both the pension division and Holly's survivor benefit payments.

Following a half-hour recess, the court announced its ruling. Crediting language in the MSA that Todd's military retirement benefits would be equitably divided based on "foregoing data," the court reasoned that it would be inequitable not to correct the $2,551 figure to reflect the actual retired base pay Todd would receive. The court reasoned that although a number was listed in the MSA, the parties intended that to reflect a formula, the inputs for which turned out to be inaccurate. Accordingly, it granted Todd's request for order and signed the proposed judgment errata correcting the judgment to award Holly $1,415 per month in net of Todd's military

9

retirement benefits. A findings and order after hearing issued, conforming to the court's oral ruling.

This case ultimately turns out to be relatively straightforward, requiring application of parol evidence to construe an ambiguous term in the parties' MSA. Independently construing the MSA in light of the undisputed extrinsic evidence, we agree with the trial court that the parties intended an equal division of the community's share of Todd's military pension. To understand how we reach this conclusion, and why Holly's arguments miss the mark, we start with the legal framework governing the division of servicemembers' military pensions at dissolution.

A. *Background on the USFSPA*

"The Federal Government has long provided retirement pay to those veterans who have retired from the Armed Forces after serving, *e.g.,* 20 years or more." (*Howell v. Howell* (2017) 137 S.Ct. 1400, 1402−1403 (*Howell*).) For someone like Todd, who joined the Navy after 1980, his retired pay is calculated based on an average of his highest 36 months of monthly basic pay earned during active military service. (10 U.S.C. § 1407(c).) A multiplier is applied to this "high-3" figure to compute retired pay. (See 10 U.S.C. § 1401(a).) Generally, the multiplier equals a servicemember's years of service at retirement (including fractional years) times 0.025. (10 U.S.C. § 1409(b)−(c); see also 10 U.S.C. § 1405(b) [computation of fractional years of service].) Retired pay is increased on December 1 of each year for cost of living adjustments based on changes to the consumer price index. (10 U.S.C. § 1401(a).)

Since its passage in 1982, the Uniformed Services Former Spouses' Protection Act (USFSPA) has authorized states to treat a military veteran's

retirement pay as community property that may be divided at divorce. (*Howell, supra,* 137 S.Ct. at pp. 1402, 1403; 10 U.S.C. § 1408(c).) This statute was enacted to partially abrogate a 1981 United States Supreme Court decision that held states were preempted from considering any portion of military retirement pay as community property. (*Howell,* at p. 1403, discussing *McCarty v. McCarty* (1981) 435 U.S. 210, 235.)

The USFSPA does not itself specify any formula for property division. Rather, it provides that courts may treat military pension as community property at dissolution. In California, the community interest in retirement benefits is typically calculated using the "time rule," which divides an employee's length of service during marriage by his or her total length of service with that employer to create a ratio that reflects the community interest in that spouse's retirement benefits. (*In re Marriage of Lehman* (1998) 18 Cal.4th 169, 176 (*Lehman*).) Under the usual formulation in Family Code section 2550, courts then divide the community portion of the retirement benefits equally between the parties.[7]

To receive payments from DFAS in accordance with a qualifying court order, a former spouse must have been married to the servicemember for 10 or more years during which the servicemember performed at least 10 years of creditable military service. (10 U.S.C. § 1408(d)(1)−(5) [commonly referred to as "the 10/10 rule"].) Where the division of military benefits is computed as a percentage of a servicemember's disposable retired pay, the former spouse's

---

[7]     Parties are not bound by the "time rule" and 50/50 division and may stipulate to a different division of retirement benefits. (See *In re Marriage of Thorne & Raccina* (2012) 203 Cal.App.4th 492, 504 (*Thorne & Raccina*) [former wife's stipulation to 16 percent of servicemember's military retired pay was valid and enforceable notwithstanding her ignorance of the "time rule"].)

11

payments are proportionally increased by postretirement cost of living adjustments. (10 U.S.C. § 1408(d)(8).) With some exceptions, "[t]he total amount of the disposable retired pay of a member payable [to the former spouse] under all court orders pursuant to subdivision (c) may not exceed 50 percent of such disposable retired pay." (10 U.S.C. § 1408 (e)(1).)

Effective December 23, 2016, Congress revised the USFSPA to add what is commonly referred to as the "frozen benefit rule." (10 U.S.C. § 1408(a)(4)(B).) This rule limits the disposable retired pay that can be divided for dissolutions finalized before a servicemember retires.[8] Where this rule applies, a servicemember's retired pay for purposes of a property division with a former spouse is calculated as a hypothetical amount of retired pay that imagines the servicemember had retired on the date of the dissolution decree. (*Ibid.*) In other words, retired pay that is to be divided is fixed based on the servicemember's rank and years of service on the dissolution date, regardless of the ultimate pension at retirement.

B.      *Question Presented and Standard of Review*

Todd and Holly read the MSA's language dividing Todd's military pension differently. According to Holly, the parties agreed to a fixed number of $2,551 per month. She maintains that the MSA quoted relevant inputs listed in the USFSPA to reflect their intent that her share would not exceed 50 percent of Todd's disposable retired pay in compliance with the statute. And although the $2,551 figure was expressly described as being based on

---

[8]     The frozen benefit rule was introduced in section 641 of the National Defense Authorization Act (NDAA) of 2017 and clarified at section 624 of the NDAA of 2018. (Pub.L. No. 328-641 (Dec. 23, 2016) 130 Stat. 2000; Pub.L. No. 91-624 (Dec. 12, 2017) 131 Stat. 1283.)

"the foregoing data," no erroneous input data preceded that phrase so as to merit a later correction.

By contrast Todd construes the pension and survivor benefit sections of the MSA together. He claims the parties laid out general criteria affecting division of his pension by citing to the 2017 NDAA's definition of retired base pay, with the figures being merely illustrative of data that would become known only at a later time. "If the intent was to award Holly a set dollar amount," Todd reasons, "it would have been easy . . . simply to state 'Holly is awarded $255[1]', but they did not do so." In Todd's view, "the parties used the phrase 'based on the foregoing data' to clarify their intent regarding how to calculate Holly's share."

In other words, we face a question of contract interpretation. Did the parties intend to divide Todd's military pension equally using USFSPA inputs, or did they intend for Holly to receive a fixed dollar amount? In construing the MSA, we apply the rules governing the interpretation of contracts generally. (*In re Marriage of Iberti* (1997) 55 Cal.App.4th 1434, 1439 (*Iberti*).) Our primary goal is to effectuate the mutual intention of the parties at the time the contract was formed. (*In re Marriage of Nassimi* (2016) 3 Cal.App.5th 667, 688.) If possible, we rely on the contract alone, using each clause to interpret the others to give effect to every part. (*Ibid.*) "When the language of a contract is 'clear, explicit, and unequivocal, and there is no ambiguity, the court will enforce the express statutory language.' " (*Ibid.*; see *In re Marriage of Hibbard* (2013) 212 Cal.App.4th 1007, 1012–1013.) "An agreement is not ambiguous merely because the parties (or judges) disagree about its meaning. Taken in context, words still matter . . . . '[W]ritten agreements whose language appears clear in the context of the

13

parties' dispute are not open to claims of "latent" ambiguity.' " (*Abers v. Rounsavell* (2010) 189 Cal.App.4th 348, 356.)

Even so, "[a] term of the agreement is ambiguous if it is susceptible of more than one reasonable interpretation." (*Iberti, supra,* 55 Cal.App.4th at p. 1439.) "Provided it supports a meaning to which the language is reasonably susceptible, extrinsic evidence is admissible to prove the parties' intent as to ambiguous terms in a marital settlement agreement." (*Ibid.*) "Where no extrinsic evidence is introduced, or the extrinsic evidence is not in conflict, we independently construe the agreement." (*In re Marriage of Schu* (2014) 231 Cal.App.4th 394, 399 (*Schu*).)

C.    *The MSA is Ambiguous*

Despite partisan arguments by both parties, the MSA is ambiguous as to what Holly and Todd intended in awarding Holly $2,551 per month from Todd's military pension. As quoted verbatim in the facts, the section of the MSA discussing Todd's pension begins with the statement that the community interest "shall be equitably divided" pursuant to the 2017 NDAA, whose frozen benefit rule considers Todd's hypothetical retired pay on the date of dissolution, increased by cost of living adjustments. It then lists various items of information including the parties' social security numbers, date of marriage, Holly's eligibility under the 10/10 rule, and consent to jurisdiction. "Based on the foregoing data," the MSA states, Holly "is hereby awarded $2,551 monthly of [Todd's] disposable military retirement pay."

Were this all that the MSA stated, we would be inclined to agree with Holly—there was no "foregoing data" to suggest the $2,551 figure relied on any particular inputs. Moreover, the parties agreed elsewhere that the MSA "may or may not result in an equal division of the community property." The "reservation of jurisdiction" section mentions that the court would have

14

jurisdiction to "[s]upervise the division of assets as agreed in this Agreement" without specifying authority to revisit how the pension was divided. In short, there is nothing in the language discussed above that would suggest anything other than an agreement on a fixed dollar amount. As Holly notes, parties may validly agree to unequal property divisions, and an unequal division does not suggest an *inequitable* one. (See, e.g., *In re Marriage of Simundza* (2004) 121 Cal.App.4th 1513, 1521 [plain language in the stipulation indicated agreement that wife would receive a fixed dollar amount of $200 from husband's pension over a 12-year period]; *Thorne & Raccina, supra,* 203 Cal.App.4th at p. 504 [stipulation unambiguously awarded wife 16 percent of servicemember's military pension notwithstanding her claim that she was unaware of the "time rule"].)

But this is not all the MSA says. Immediately following the $2,551 figure, the MSA goes on to discuss the Survivor Benefit Plan, an annuity allowing Holly to recover military pension benefits if Todd predeceased her. Holly could elect to participate in the plan "at the time of [Todd's] retirement" and pay the monthly premiums. The survivor benefit plan section explains the parties' express intent for Todd's military benefits to be divided "consistent with" the USFSPA and reserved jurisdiction for the Superior Court "to make any orders necessary to effectuate the division of the military retirement benefits consistent with the [USFSPA]." The section then lists inputs that turned out to be wrong regarding Todd's high-3 retired base pay. Combined with the parties' express intent to "equitably" divide the military pension, it seems plausible that the "foregoing data" refers to the incorrect input data that follows as part of the discussion of the Survivor Benefit

15

Plan.[9] (See Civ. Code, § 1641 [courts should construe contractual clauses together], 1640 [if a written contract fails to express the parties' real intent through mistake or accident, erroneous parts of the writing must be disregarded].)

Thus, the MSA's plain language is ambiguous.

D.   *Extrinsic Evidence Supports the Family Court's Construction*

To resolve the MSA's ambiguity, we look to admissible extrinsic evidence to prove a meaning to which the contract is reasonably susceptible. (*Iberti, supra,* 55 Cal.App.4th at p. 1439.)  Here, that foundational evidence is undisputed, although the parties seek to draw widely divergent inferences from the uncontroverted facts.  (*Medical Operations Management, Inc. v. National Health Laboratories, Inc.* (1986) 176 Cal.App.3d 886, 891 ["[I]t is only when the foundational extrinsic evidence is in conflict that the appellate court gives weight to anything other than its de novo interpretation of the parties' agreement."].)

Holly said two things in her declarations—(1) she accepted the fixed dollar amount in consideration for reduced spousal support (see, e.g., *Adams v. Adams* (1947) 29 Cal.2d 621, 624); and, somewhat conflictingly, (2) they could have used percentages, but it was Todd "who thought it best to have the amount included in our MSA rather than spend the money later to have it correctly prepared."  Todd stated in his declaration that the parties sought to divide the pension equally.  In support of his RFO, he lodged an e-mail chain

_____

9    As Holly suggests, it is possible to read "equitable" as merely referring to the frozen benefit rule, which as a matter of equity does not allow a former spouse to claim the benefit of postdissolution promotions that increase a military pension.  But that is not the only reading nor the ultimate interpretation we adopt after consulting relevant extrinsic evidence.

16

that was created a month before the MSA's execution, in which Todd's counsel suggested the $2,551 number.

In claiming that she accepted $2,551 per month from Todd's pension as consideration for reduced spousal support, Holly does not point to any documents or reference any conversations between the parties before the MSA was signed that would support her professed understanding. California follows the objective theory of contracts, in which a party's undisclosed intent or understanding is irrelevant to contract interpretation. (*Kim v. TWA Construction, Inc.* (2022) 78 Cal.App.5th 808, 836, citing *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956.) Because Holly's undisclosed subjective interpretation does not create a conflict in the admissible extrinsic evidence, our review is de novo. (See *Schu, supra,* 231 Cal.App.4th at p. 399.)

As Holly herself referenced in her declaration, there was e-mail communication between the parties before the MSA was signed. She is correct that Todd's counsel thought it best to include a fixed number. But a full reading of that e-mail chain overwhelmingly supports the trial court's conclusion that the MSA intended an equal division of the community's interest in Todd's pension.

On May 31, 2019, Todd's counsel William Trausch wrote to Holly's attorney, Edward Satuloff, indicating that Todd agreed to continue spousal support until he retired. Although Todd submitted his retirement request more than a year earlier, he was still waiting for approval and anticipated retiring on March 1, 2021. Trausch attached a proposed stipulated judgment for Satuloff's review.

17

Satuloff replied that same day. He began in a cooperative tone:

> "Thank you for preparing the judgment packet. I have forwarded it to Holly . . . appreciate Todd agreeing to the ongoing spousal support . . . ."

Reflecting that the parties had reached agreement on virtually every issue, he went on to identify the "[o]nly remaining concern," which was "the specific language needed for the division of the military pension." Satuloff proposed some language for Trausch's review that he believed reflected "the standard language now used in MSAs." Setting aside the issue of Holly's payment of Survivor Benefit Plan premiums, Satuloff believed the following language would be "neutral" while ensuring "the proper division":

> " 'The parties have a community interest in Husband's military retirement benefits due to Husband's military service during marriage. Husband is active duty at the time of the parties' Judgment. Husband earned at least 10 years of service between the Date of Marriage and the Date of separation which satisfies the 10/10 Rule. Within 30 days of signing this Agreement, Husband and Wife shall jointly retain a QDRO attorney to prepare a Domestic Relations Order which divides the community interest in the military benefits.

> " 'The community interest in the military benefits shall be calculated using the time rule formula where the numerator is the number of months of creditable service earned between the Date of Marriage and the Date of Separation and the denominator is the total number of months of creditable service earned as of the date the parties' Judgment is entered with the court.

> " 'The parties acknowledge that for purposes of calculating the community interest, DFAS will use the high-3 salary and years of service earned as of the parties' date of Judgment. [Husband shall be required to provide the QDRO attorney with salary information and years of service history to determine the high-3 salary and months of service as of the parties' date of Judgment.

" 'There is also a community interest in the Survivor Benefit Plan and Wife shall be named as the beneficiary of the Survivor Benefit Plan in the Domestic Relations Order. The parties intend that the division of military benefits shall be consistent with Uniformed Services Former Spouses' Protection Act ("USF[S]PA") in effect as of the date of Judgment, and the court shall reserve jurisdiction to make any orders necessary to effectuate the division of the military benefits consistent with the USF[S]PA.' "

Satuloff's proposed language tracked the USFSPA's frozen benefit rule and the "time rule" to determine the community's interest in Todd's military pension. Had this language been incorporated into the MSA, a QDRO attorney would have used relevant inputs to derive the community's share thirty days after the judgment and suggest a 50/50 division under Family Code section 2550. The second paragraph of Satuloff's e-mail refutes Holly's suggestion that the parties negotiated the pension division and spousal support together. Satuloff's reference to the "[o]nly remaining concern" indicates that spousal support had been resolved *before* the parties turned to language dividing the pension.

Responding to Satuloff a few days later, Trausch wrote:

"Here is revised Stipulated Judgment Attachment in the Ferrari matter with Revisions at pages 6–8 regarding divisions of retirements. Revisions to Todd's Military retirement language was taken directly from DFAS website materials and sample orders. This language will likely preclude the necessity of another separate Court order dividing the military retirement and fees/costs of same.

"Holly's military retirement amount of $2,551. was calculated as follows:

"Date of Marriage: 10-27-1995[;]

"Date of Separation: 06-01-2016[;]

"Marital period: 20 years 8 months or 248 months[;]

19

"Numerator:   248 months[;]

"Todd's length of military service to March 1, 2021: 27 years 7 months or 331 months[;]

"Denominator:   331 months[;]

"Calculation:   (248/331)/2 = .374 x 100% = 37.4% (Holly's community interest)[;]  [and]

"Benefit Calculation: 37.4% of $6,821. = $2,551. (Holly's benefit[.])"

Trausch's response to Satuloff contains so many input errors it could serve as a cautionary tale against lawyers performing anything but the simplest of mathematical calculations.  The marital period was 247 months, not 248.  Todd's military service was 312 months to the date of the *dissolution judgment*, which was the relevant date under the frozen benefit rule.  Dividing these two figures gives Holly a 39.58 percent share in the retirement, not 37.4 percent.  Todd's retired base pay was also inflated, as Trausch appeared to use an *erroneous* high-3 estimate *without* applying the statutory multiplier (a product of Todd's years of service and 0.025, see 10 U.S.C. § 1409(b)−(c)).

Through this thicket of mistakes, what is nevertheless clear is that Trausch was proposing to use the "time rule" to calculate the community's interest in Todd's pension (dividing months of service during marriage by total months of service) and thereafter to divide the community's share equally between the parties.  (See *Lehman, supra,* 18 Cal.4th at p. 176; Fam. Code, § 2550.)  While hindsight has proven him wrong, Trausch was under the impression that using inputs "taken directly from DFAS website materials and sample orders" would "likely preclude the necessity of another separate Court order dividing the military retirement and fees/costs of same." It strains credulity to think that Trausch, as Todd's lawyer, would reject the

language proposed by Satuloff and instead insist on some arbitrary fixed dollar amount that would give Holly substantially more than she would receive using the formula her own lawyer had suggested. To the contrary, Trausch proposed $2,551 per month to Holly, imagining this would result in an equal division based on Satuloff's formula and avoid the need to obtain a later court order.

This e-mail exchange establishes that the parties intended an equal division of the community's share in Todd's military pension, but simply flubbed the numbers. Contrary to Holly's suggestion that adjusting the $2,551 figure would reopen the entire MSA, the e-mail chain demonstrates that the parties resolved the issue of spousal support—with Todd paying until he retired—before fine-tuning language dividing the military pension.[10] What the parties agreed to was not a fixed number, but rather an equitable division based on the time rule and applicable USFSPA inputs.

Kristine Colburn, the QDRO attorney, corrected Trausch's input errors. She first estimated the pot of retirement benefits that was to be divided under the USFSPA. Applying the frozen benefit rule, Colburn estimated Todd's retired base pay as if he had retired on the dissolution date. (10 U.S.C. § 1408(a)(4)(B).) Working backwards, she averaged out the highest 36 months of basic pay to reach a high-3 figure of $6,581. She applied a

_____

[10] To the extent the MSA is ambiguous, Holly claims the e-mails support her, not Todd. She contends Todd rejected the formula division proposed by Satuloff because a fixed number would eliminate the annual cost of living adjustments baked into the USFSPA. (See 10 U.S.C. § 1408(d)(8).) But there is no nonspeculative basis to assume that the parties agreed on a fixed dollar amount calculated using entirely incorrect inputs to avoid annual cost of living adjustments. Trausch's suggestion that using the $2,551 figure would likely avoid the need for a separate court order appears to accept Satuloff's proposed formula as the appropriate methodology to divide the community's share.

multiplier to that number to arrive at his hypothetical retired base pay amount of $4,278 under the frozen benefit rule. (10 U.S.C. § 1409(b)−(c).) To determine the community interest in that retired pay, Colburn applied the usual "time rule." With 247 months of marriage that overlapped with Todd's 312 months of military service at the time of dissolution, the marital share of Todd's military pension was 79.17 percent. Holly would get half of that share, or 39.58 percent. (*Lehman, supra,* 18 Cal.4th at p. 176; Fam. Code, § 2550.) Taking from this amount the estimated $278 in monthly survivor benefit premiums that Holly agreed to pay, Colburn determined that Holly was entitled to $1,415 per month of Todd's military pension.

Accepting this analysis, the family court modified the judgment to reflect this division. In so doing, it did not err.

E.    *Holly's Counterarguments*

Holly's various arguments do not persuade us otherwise. First, she contends that the MSA cited the NDAA factors not to suggest any particular formula, but rather to prove that Holly would not receive more than 50 percent of Todd's disposable retired pay from DFAS, as is statutorily required. (10 U.S.C. § 1408(e)(1).) We agree to a point—the *MSA* does not expressly identify any particular formula used to divide the military pension. It cites the 2017 NDAA to say the pension "shall be equitably divided" under the frozen benefit rule. The frozen benefit rule, in turn, is not a formula but merely an input that imagines Todd's hypothetical retirement pay as if he retired on the date of dissolution. (10 U.S.C. § 1408(a)(4)(B).) Although the MSA uses the word "equitably," it nowhere expresses an intent to award a 50/50 share of the community's interest, calculated using the time rule.

But that only gets Holly so far. Direct payment is nowhere mentioned in the MSA or in the parties' e-mails before its execution. There is no

22

reasonable basis to conclude that the parties referenced the NDAA merely to show they would comply with an unarticulated statutory requirement. Indeed, at the risk of engaging in more lawyer-math, Holly *would* receive more than 50 percent of Todd's retired base pay if the $2,551 figure were affirmed.[11]  More to the point, irrespective of the MSA's express language, extrinsic evidence establishes that the parties intended to divide Todd's military pension 50/50 using the "time rule" and USFSPA inputs rather than settle on a fixed dollar amount representing a different percentage.

Next, Holly maintains that the trial court overlooked the plain language of the MSA.  The MSA awarded her $2,551 of Todd's pension "based on the 'foregoing data,' " but there was no input data preceding this amount. Although a high-3 figure of $6,821 was stated under the separate "Survivor Benefit Plan" section, that did not precede the $2,551 figure.  True enough— we found the MSA ambiguous in part because on its face, this construction was reasonable.  Holly is correct that our role is to ascertain what is written, not to insert what is omitted.  (See *Iberti, supra,* 55 Cal.App.4th at p. 1440.) But in resolving contractual ambiguity, we may consider extrinsic evidence supporting a meaning to which the MSA is reasonably susceptible.  (*Id.* at p. 1439.)  Once we consider the admissible extrinsic evidence, it becomes clear that the $2,551 figure was indeed derived using an erroneous high-3

---

11    Holly makes the same mistake Trausch did in his e-mail.  Todd's retired base pay is his high-3 amount *adjusted by a multiplier*.  (10 U.S.C. § 1409(b)−(c).)  That multiplier comes to about 65 percent of his high-3 average (0.025 x 26 years of service).  Even using the MSA's *inflated* high-3 average of $6,821, Todd's retired base pay amounts to $4,419.  $2,551 is *more than* 50 percent of this amount.

input of $6,821 per month—the very input listed under the Survivor Benefit Plan section of the MSA.[12]

Finally, Holly points out that Todd did not timely file a set aside motion. "After entry of a judgment incorporating a marital settlement agreement, any ground for avoiding the agreement must be pursued by statutory remedies to set aside the judgment, coupled with a motion to vacate the 'tainted' portions of the underlying agreement." (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2022) ¶ 9:446; see Code Civ. Proc., § 473, subd. (b) [six month deadline to set aside on grounds of mistake, inadvertence, surprise, or excusable neglect]; Fam. Code, § 2122, subd. (e) [one year deadline to set aside for mistake].) But Todd did not seek to set aside the MSA on grounds of mistake. He instead sought to clarify its language *to effectuate the parties' actual intent at the time of contracting*.[13] Civil Code section 3399 allows a court to revise a contract's express terms "[w]hen, through . . . a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties." That is all that happened here.

---

[12] While Holly suggests in passing that the court relied "upon incompetent evidence," she does not offer legal authority or explain through argument why contemporaneous e-mails on the very clause at issue constituted incompetent extrinsic evidence of the parties' intent.

[13] It is immaterial that a non-California court concluded that a property division was not void even if erroneously calculated. (*Gross v. Wilson* (Alaska 2018) 424 P.3d 390, 396−397.) The question is not whether the MSA is voidable for mistake or even void, but rather whether the parties intended to give Holly a fixed dollar amount or an equal share based on statutorily required inputs.

DISPOSITION

The order is affirmed. Todd is entitled to recover his costs on appeal.


DATO, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.